



Search for Cases by:  Select Search Method...  ▼

| Judicial Links | eFiling | Help | Contact Us | Print | GrantedPublicAccess  Logoff JOE_KOPCHICK |

## 2022-CC01133 - RANDALL SALLY V PANERA BREAD COMPANY ET AL (E-CASE)

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

**Click here to eFile on Case**
Click here to Respond to Selected Documents

Sort Date Entries:  ● Descending  ○ Ascending

Display Options:  All Entries  ▼

---

**07/23/2020** ☐ **Summons Personally Served**
Document ID - 20-SMCC-2441; Served To - PANERA BREAD COMPANY; Server - ; Served Date - 14-JUL-20; Served Time - 07:35:00; Service Type - Sheriff Department; Reason Description - Served

**07/07/2020** ☐ **Summons Issued-Circuit**
Document ID: 20-SMCC-2442, for PANERA LLC.

☐ **Summons Issued-Circuit**
Document ID: 20-SMCC-2441, for PANERA BREAD COMPANY.

**06/29/2020** ☐ **Jury Trial Scheduled**
   Scheduled For: 12/07/2020;  9:00 AM ;  REX M BURLISON;  City of St. Louis

**06/19/2020** ☐ **Entry of Appearance Filed**
Entry of Appearance as Co-Counsel; Electronic Filing Certificate of Service.
   **Filed By:** ADAM MARTIN GOFFSTEIN
   **On Behalf Of:** RANDALL SALLY

**06/10/2020** ☐ **Filing Info Sheet eFiling**
   **Filed By:** DANIEL JOHN ORLOWSKY

☐ **Note to Clerk eFiling**
   **Filed By:** DANIEL JOHN ORLOWSKY

☐ **Pet Filed in Circuit Ct**
Class Action Petition for Damages; Exhibit A; Exhibit B; Exhibit C; Exhibit D.
   **Filed By:** DANIEL JOHN ORLOWSKY
   **On Behalf Of:** RANDALL SALLY

☐ **Judge Assigned**

---

**2022-CC01133**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

| | | |
|---|---|---|
| RANDALL SALLY, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. |
| vs. | ) ) | Division: |
| PANERA BREAD COMPANY, a/k/a SAINT LOUIS BREAD CO., Serve:  Registered Agent CSC-LAWYERS INCORPORATING SERVICE 221 Bolivar Jefferson City, MO 65101 | ) ) ) ) ) ) ) ) | |
| and | ) ) | |
| PANERA, LLC, Serve:  Registered Agent CSC-LAWYERS INCORPORATING SERVICE 221 Bolivar Jefferson City, MO 65101 | ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## CLASS ACTION PETITION FOR DAMAGES

COME NOW Plaintiff Randall Sally, on behalf of himself and all others similarly situated in the State of Missouri, through his attorneys, and brings this action against Defendants Panera Bread Company, a/k/a Saint Louis Bread Co., and Panera, LLC (hereinafter collectively referred to as "Defendants," "Saint Louis Bread Co.," or "Panera"); and, upon information and belief, except as to the allegations that pertain to himself, which are based upon based upon personal knowledge, alleges as follows:

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

## NATURE OF THE ACTION

1.      Plaintiff brings this action on his own behalf and as a representative of a class of persons consisting of all Missouri citizens who purchased Saint Louis Bread Co. Products for personal, family, or household purposes.

2.      Defendant develops, manufacturers, markets, distributes, and sells a variety of personal, family, or household products, including:

- Saint Louis Bread Co. Brioche Roll;
- Saint Louis Bread Co. Classic White Bread;
- Saint Louis Bread Co. Sea Salt Focaccia;
- Saint Louis Bread Co. French Baguette;
- Saint Louis Bread Co. Asiago Cheese;
- Saint Louis Bread Co. Cinnamon Raisin Swirl;
- Saint Louis Bread Co. Sourdough;
- Saint Louis Bread Co. Tomato Basil;
- Saint Louis Bread Co. Sprouted Grain Roll;
- Saint Louis Bread Co. Honey Wheat;
- Saint Louis Bread Co. Asiago Cheese Focaccia;
- Saint Louis Bread Co. Country Rustic;
- Saint Louis Bread Co. Farmstyle XL Loaf;
- Saint Louis Bread Co. Whole Grain;
- Saint Louis Bread Co. Artisan Ciabatta;
- Saint Louis Bread Co. Chocolate Croissant;
- Saint Louis Bread Co. Cheese Brittany;
- Saint Louis Bread Co. Pecan Braid;
- Saint Louis Bread Co. Bear Claw;
- Saint Louis Bread Co. Cherry Cheese Brittany;
- Saint Louis Bread Co. Croissant;
- Saint Louis Bread Co. Almond Croissant;
- Saint Louis Bread Co. Pastry Ring;
- Saint Louis Bread Co. Vanilla Cinnamon Roll;
- Saint Louis Bread Co. Apple Pie Thumbprint Cookie;
- Saint Louis Bread Co. Heart Cookie;
- Saint Louis Bread Co. Kitchen Sink Cookie;
- Saint Louis Bread Co. Oatmeal Raisin with Berries Cookie;
- Saint Louis Bread Co. Candy Cookie;
- Saint Louis Bread Co. Petite Chocolate Chipper;

- Saint Louis Bread Co. Chocolate Chipper Cookie;
- Saint Louis Bread Co. Cocoa & Crème Cookie;
- Saint Louis Bread Co. Homestyle Chocolate Chunk Cookie;
- Saint Louis Bread Co. Lemon Drop Cookie;
- Saint Louis Bread Co. Blueberry Muffin with Fresh Blueberries;
- Saint Louis Bread Co. Pumpkin Muffin;
- Saint Louis Bread Co. Cranberry Orange Muffin;
- Saint Louis Bread Co. Chocolate Chip Muffie;
- Saint Louis Bread Co. Pumpkin Muffie;
- Saint Louis Bread Co. Apple Cinnamon Crunch Scone;
- Saint Louis Bread Co. Blueberry Scone;
- Saint Louis Bread Co. Cinnamon Crunch Scone;
- Saint Louis Bread Co. Orange Scone;
- Saint Louis Bread Co. Brownie;
- Saint Louis Bread Co. Cinnamon Crum Coffee Cake;
- Saint Louis Bread Co. Sprouted Grain Bagel Flat;
- Saint Louis Bread Co. Everything Bagel;
- Saint Louis Bread Co. Plain Bagel;
- Saint Louis Bread Co. Chocolate Chip Bagel;
- Saint Louis Bread Co. Whole Grain Bagel;
- Saint Louis Bread Co. French Toast Bagel;
- Saint Louis Bread Co. Sesame Bagel;
- Saint Louis Bread Co. Cinnamon Crunch Bagel;
- Saint Louis Bread Co. Asiago Cheese Bagel;
- Saint Louis Bread Co. Cinnamon Swirl & Raisin Bagel;
- Saint Louis Bread Co. Blueberry Bagel;
- Saint Louis Bread Co. Maple Bacon, Scrambled Eggs & Cheese Wrap;
- Saint Louis Bread Co. Chipotle Chicken, Scrambled Eggs & Avocado;
- Saint Louis Bread Co. Mediterranean Egg White Wrap;
- Saint Louis Bread Co. Bacon, Egg & Cheese;
- Saint Louis Bread Co. Bacon, Scrambled Egg & Cheese on Ciabatta;
- Saint Louis Bread Co. Sausage, Egg & Cheese;
- Saint Louis Bread Co. Egg & Cheese;
- Saint Louis Bread Co. Ham, Egg & Cheese;
- Saint Louis Bread Co. Steak & Egg;
- Saint Louis Bread Co. Avocado, Egg White & Spinach;
- Saint Louis Bread Co. Spinach & Bacon Souffle;
- Saint Louis Bread Co. Ham & Swiss Souffle;
- Saint Louis Bread Co. Bistro French Onion Soup;
- Saint Louis Bread Co. Baked Potato Soup;
- Saint Louis Bread Co. Broccoli Cheddar Soup;

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

- Saint Louis Bread Co. Vegetarian Creamy Tomato Soup;
- Saint Louis Bread Co. Turkey Chili;
- Saint Louis Bread Co. Vegetarian Autumn Squash Soup;
- Saint Louis Bread Co. Ten Vegetable Soup;
- Saint Louis Bread Co. Low-Fat Chicken Soup;
- Saint Louis Bread Co. Modern Greek Salad with Quinoa;
- Saint Louis Bread Co. Caesar Salad;
- Saint Louis Bread Co. Caesar Salad with Chicken;
- Saint Louis Bread Co. Greek Salad;
- Saint Louis Bread Co. Green Goddess Cobb Salad with Chicken;
- Saint Louis Bread Co. Southwest Chile Lime Ranch Salad with Chicken;
- Saint Louis Bread Co. Spicy Thai Salad with Chicken;
- Saint Louis Bread Co. Fuji Apple Salad with Chicken;
- Saint Louis Bread Co. Seasonal Greens Salad;
- Saint Louis Bread Co. Asian Sesame Salad with Chicken;
- Saint Louis Bread Co. Baja Grain Bowl with Chicken;
- Saint Louis Bread Co. Baja Grain Bowl;
- Saint Louis Bread Co. Mediterranean Grain Bowl with Chicken;
- Saint Louis Bread Co. Mediterranean Grain Bowl;
- Saint Louis Bread Co. Baja Mac & Cheese;
- Saint Louis Bread Co. BBQ Chicken Mac & Cheese;
- Saint Louis Bread Co. Mac & Cheese;
- Saint Louis Bread Co. Chicken Tortellini Alfredo;
- Saint Louis Bread Co. Sierra Turkey;
- Saint Louis Bread Co. Chipotle Chicken Avocado Melt;
- Saint Louis Bread Co. Toasted Frontega Chicken;
- Saint Louis Bread Co. Toasted Steak & White Cheddar;
- Saint Louis Bread Co. Tuna Salad Sandwich;
- Saint Louis Bread Co. Modern Caprese Sandwich;
- Saint Louis Bread Co. Roasted Turkey, Apple & Cheddar Sandwich;
- Saint Louis Bread Co. Turkey Sandwich;
- Saint Louis Bread Co. Mediterranean Veggie Sandwich;
- Saint Louis Bread Co. Steak & Arugula Sandwich;
- Saint Louis Bread Co. Napa Almond Chicken Salad Sandwich;
- Saint Louis Bread Co. The Cuban;
- Saint Louis Bread Co. Bacon Tomato Grilled Cheese;
- Saint Louis Bread Co. Saint Louis Bread Co. Classic Grilled Cheese;
- Saint Louis Bread Co. Heritage Ham & Swiss Sandwich;
- Saint Louis Bread Co. Toasted Tuscan Grilled Sandwich;
- Saint Louis Bread Co. Roasted Turkey & Avocado BLT;
- Saint Louis Bread Co. Bacon Turkey Bravo Sandwich;

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

- Saint Louis Bread Co. Kids Mac & Cheese;
- Saint Louis Bread Co. Kids Turkey Chili;
- Saint Louis Bread Co. Kids Vegetarian Autumn Squash Soup;
- Saint Louis Bread Co. Kids Ten Vegetable Soup;
- Saint Louis Bread Co. Kids Vegetarian Creamy Tomato Soup;
- Saint Louis Bread Co. Kids Baked Potato Soup;
- Saint Louis Bread Co. Kids Low-Fat Chicken Noodle Soup;
- Saint Louis Bread Co. Kids Bistro French Onion Soup;
- Saint Louis Bread Co. Kids Broccoli Cheddar Soup;
- Saint Louis Bread Co. Kids Seasonal Greens Salad;
- Saint Louis Bread Co. Kids Greek Salad;
- Saint Louis Bread Co. Kids Caesar Salad;
- Saint Louis Bread Co. Kids Turkey Sandwich;
- Saint Louis Bread Co. Kids Peanut Butter & Jelly;
- Saint Louis Bread Co. Kids Grilled Cheese;
- Saint Louis Bread Co. Kids Artisan Ham Sandwich;
- Saint Louis Bread Co. Frozen Caramel Cold Brew;
- Saint Louis Bread Co. Frozen Mocha Cold Brew;
- Saint Louis Bread Co. Peach & Blueberry Smoothie with Almond Milk;
- Saint Louis Bread Co. Cold Brew – Madagascar Vanilla Cream;
- Saint Louis Bread Co. Iced Madagascar Vanilla Latte;
- Saint Louis Bread Co. Iced Chai Tea Latte;
- Saint Louis Bread Co. Lipton Brisk Raspberry Tea;
- Saint Louis Bread Co. Passion Papaya Green Tea;
- Saint Louis Bread Co. Blood Orange Lemonade;
- Saint Louis Bread Co. Iced Caffe Mocha;
- Saint Louis Bread Co. Tropical Fruit Punch;
- Saint Louis Bread Co. Iced Caramel Latte;
- Saint Louis Bread Co. Signature Hot Chocolate;
- Saint Louis Bread Co. Caffe Mocha;
- Saint Louis Bread Co. Caramel Latte;
- Saint Louis Bread Co. Skinny Caffe Mocha;
- Saint Louis Bread Co. Chai Tea Latte;
- Saint Louis Bread Co. Madagascar Vanilla Latte

(hereinafter the "Saint Louis Bread Co. Products" or the "Products").[1]

---

[1] Plaintiff reserves the right to amend this Petition to include any additional food items sold by Saint Louis Bread Co. that contain artificial preservatives, sweeteners, flavors, or colors and are within the scope of this Petition.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

3.    Plaintiff brings this action individually and as class representative to recover damages for violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq*., for economic relief against Saint Louis Bread Co., which tested, marketed, distributed, promoted, and sold the Products.

4.    Saint Louis Bread Co. markets the Products as "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources.  Saint Louis Bread Co. claims that every item on its United States food menu is "clean."

5.    Consumers expect products that are marketed as "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources to not contain any artificial, chemical, and/or synthetic preservatives, sweeteners, flavors, or colors.

6.    Although the Products were marketed, advertised, and sold as "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources, the Products contain multiple ingredients that are artificial, chemical, and/or synthetic preservatives, sweeteners, flavors, and colors, as detailed further herein.

7.    Saint Louis Bread Co. misrepresented, and/or concealed, suppressed, or omitted material facts in connection with the sale, distribution, and/or advertisement of the Products. Therefore, Plaintiff, on behalf of himself and the putative class, seeks a refund for monies paid as a result of their purchases of the Products.

## PARTIES

8.    At all relevant times, Plaintiff Sally was and is a citizen of the State of Missouri. During the Class Period, Plaintiff Sally has purchased Saint Louis Bread Co. Products for personal, family, or household use.  Plaintiff Sally's purchases include, without limitation Saint Louis Bread Co. French Baguette, Saint Louis Bread Co. Bacon Turkey Bravo Sandwich, Saint

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Louis Bread Co. Caesar Salad with Chicken, Saint Louis Bread Co. Mac & Cheese, and Saint Louis Bread Co. Chocolate Chipper Cookie.  Accordingly, Plaintiff Sally has been injured as a result of Defendants' unlawful conduct alleged herein.

9.      Defendant Panera Bread Company, a/k/a Saint Louis Bread Co, manufactures, distributes, markets, and sells the Products.  Panera Bread Company is a national bakery chain with Company-owned and franchise-operated locations in 46 states, the District of Columbia, and Canada.  The Company also operates under the "Panera Bread" and "Saint Louis Bread Co." names.  It is a Delaware corporation in good standing in the State of Missouri, with its principal place of business and corporate headquarters located at 3630 South Geyer Road, Suite 100, St. Louis, Missouri 63127.  Defendant conducts business, including advertising and selling the Products, throughout Missouri, including the City of St. Louis, Missouri.  Panera Bread Company holds itself out to the public as a manufacturer of "clean" food.

10.      Defendant Panera, LLC is a Delaware limited liability company in good standing in the State of Missouri, with its principal place of business and corporate headquarters located at 3630 South Geyer Road, Suite 100, St. Louis, Missouri 63127.  Panera, LLC is a wholly owned subsidiary of Panera Bread Company, a/k/a Saint Louis Bread Co.

## JURISDICTION AND VENUE

11.      This Court has personal jurisdiction over this matter pursuant to Mo. Rev. Stat. §§ 478.070 and 506.500 because Defendants are registered to conduct business in Missouri, have their principal place of business and headquarters in Missouri at 3630 South Geyer Road, Suite 100, St. Louis, Missouri, are present, have transacted and conducted, and continue to transact and conduct substantial business in Missouri, have a registered agent in Missouri, consistently and purposefully avail themselves of the privileges of conducting business in Missouri and in this

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

judicial district, and can fairly be regarded as at home in Missouri.[2]  Furthermore, Defendants committed a tortious act within this state by marketing, distributing, promoting, and selling the Products in Missouri in a manner which violates the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq.*, as detailed further herein.

12.     This Court has personal jurisdiction over Defendants because the acts and/or omissions which are the subject of this litigation occurred in the City of St. Louis, Missouri, and Defendants regularly conducts business in the City of St. Louis, Missouri.

13.     As a result of the marketing, distribution, sale, and delivery of the Products, which would be sold to Plaintiff in the State of Missouri, Defendants, directly and through their subsidiaries, affiliates, or agents, obtained the benefits of the laws of the State of Missouri.

14.     Neither Plaintiff nor any member of Plaintiff's Class assert any federal question. Plaintiff asserts only violations of the Missouri Merchandising Practices Act.  Plaintiff specifically denies any intent to state a cause of action arising under the laws of the United States of America, including any claim for injunctive relief available under federal law.

15.     Venue is proper in this Court pursuant to Mo. Rev. Stat. §§ 508.010.4 and 407.025.

---

[2] Defendants both admit that their corporate headquarters and principal place of business are in Missouri.  Defendants' Answer to Plaintiffs' Complaint, *Boswell, et al .v. Panera Bread Company, et al.*, 4:14-cv-01833-AGF, at ¶¶ 14, 15, 22, 23 (E.D. Mo. Dec. 12, 2014) (attached hereto as Exhibit A).  Defendant Panera, LLC has also affirmatively represented in federal court filings in Missouri that its principal place of business is in Missouri and that it is a wholly owned subsidiary of Defendant Panera Bread Company.  Complaint of Panera, LLC, *Panera, LLC v. Dobson, et al*, 4:19-cv-00276, at ¶1 (E.D. Mo. Feb. 21, 2019) (attached hereto as Exhibit B).

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

## FACTUAL ALLEGATIONS

### Defendants' False and Misleading Representations

16.     Defendants have misrepresented that all of their products are "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources throughout the Class Period.

17.     Defendants define clean food and what the "clean" representations to consumers mean as follows: "Every item found on our U.S. food menu is clean – with no artificial preservatives, sweeteners, flavors, or colors from artificial sources – because we believe clean, simpler foods taste better."[3]

18.     Defendants' marketing materials are replete with statements that their food menu is "100% clean" and/or "clean" and do not contain any artificial preservatives, sweeteners, flavors, or colors from artificial sources.

19.     Saint Louis Bread Co. claims that "100% of our food is clean."   Saint Louis Bread Co.'s website contains the following statement: "Food is as it should be.  That's food we think tastes better, feels better, does better.  **It's clean food.  Food without artificial preservatives, sweeteners, flavors or colors from artificial sources.**"

20.     Saint Louis Bread Co.'s website states that the company is "committed to food that is 100% clean in all our US bakery-cafes and grocery products. **At Panera, clean describes food that does not contain artificial preservatives, sweeteners, and flavors along with colors from artificial sources**."

21.     Saint Louis Bread Co.'s website contains numerous additional statements about the company's "clean journey" and its "all-clean menu":

---

[3] https://www.panerabread.com/en-us/our-beliefs/our-food-policy/clean-ingredients.html

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

- "In June of 2014, we announced our plans to remove these artificial additives from our food menu by the end of 2016.  **Today, we can say with 100% certainty (and that's hard to come by), that 100% of our food menu is clean**."

- "**Clean Soups**:  After two years of hard work (and 60 versions of Broccoli Cheddar), our soups were deemed 100% clean in January 2016. That's every single spoonful."

- "**Clean Salads**:  Summer of 2016 brought more than just salad season.  It was a time to celebrate fresh ingredients and, for the first time, 100% clean salads."

- "**Clean Sandwiches**:  Fall of 2016 marked some big moments in clean food at Panera. The star of the season?  Our deli turkey.  Made with just four simple ingredients—turkey breast, water, sea salt and potato starch—it's now 100% clean, has 50% less sodium than our old deli turkey, and comes from turkeys fed a vegetarian diet and raised without antibiotics."

- "**Clean Breakfast**:  Bacon. This beloved breakfast staple overcame its artificial shortcomings to become a star of our 100% clean food menu—complete with a better bite and smokier taste—in late 2016."

- "**Clean Bakery**…a new clean cookie lineup."

22.     In addition to featuring prominently in Defendants' advertising and marketing materials, Saint Louis Bread Co. misrepresents that the Products are "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources on bags, signs, and labels at the point-of-sale throughout Defendants' physical locations.

23.     For example, signs and placards displayed in Saint Louis Bread Co.'s retail outlets or restaurants in Missouri contain statements such as "Food should be clean.  No artificial

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

colors, preservatives, sweeteners, flavors, or anything else you wouldn't want to serve your

family."



24.     Additionally, bags used for the Products include statements such as "100% clean

food:  No artificial flavors sweeteners, preservatives / No colors from artificial sources."

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM



25.     The marketing, advertising, and point-of-sale for the Products claims that they are "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources.  However, each of these representations is false.  Under Defendants' own definition, and the expectations of reasonable consumers, the Products cannot be considered "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources because they contain multiple ingredients that are artificial, chemical, and/or synthetic preservatives, sweeteners, flavors, or colors.

26.     Defendants consistently and systemically marketed and advertised the Products as "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources throughout the Class Period.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**Defendants' Products Contain Multiple Artificial Preservatives, Sweeteners, Flavors, and Colors from Artificial Sources**

27.     Saint Louis Bread Co.'s representations that its Products are "100% clean" and/or "clean" and do not contain any artificial preservatives, sweeteners, flavors, or colors from artificial sources are false, misleading, and deceptive because the Products contain multiple ingredients that are artificial, chemical and/or synthetic preservatives, sweeteners, flavors, or colors.

28.     Saint Louis Bread Co.'s claims that the Products contain no artificial preservatives is false and misleading.  The Products contain **ascorbic acid, citric acid, potassium sorbate,** and **tocopherols**, whose functions as artificial preservatives have been well-documented.  These ingredients function as preservatives in the Products.

29.     The Food and Drug Administration ("FDA") defines a chemical preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."  21 C.F.R. § 101.22(a)(5).

30.     The ascorbic acid, citric acid, potassium sorbate, and tocopherols have precisely this effect.

31.     The MacMillan Dictionary defines "tends" as "to usually do a particular thing," as in "He tends to exaggerate" or "The gym tends to get very busy at around six o'clock."[4]  The scientific evidence and FDA statements cited below establish that ascorbic acid, citric acid, potassium sorbate, and tocopherols both tend to prevent or retard the deterioration of food.  This

---

[4] https://www.macmillandictionary.com/us/dictionary/american/tend

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

remains the case regardless of the subjective purpose for which this substance is added to the Products.

32.     Ascorbic acid, citric acid, potassium sorbate, and tocopherols do not fall into any of the regulatory exemptions from the definition of a preservative.

33.     The FDA expressly classifies ascorbic acid, citric acid, potassium sorbate, and tocopherols as preservatives in its <u>Overview of Food Ingredients, Additives, and Colors</u>, on the FDA's website:

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| Preservatives | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetable | **Ascorbic acid**, **citric acid**, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, **potassium sorbate**, BHA, BHT, EDTA, **tocopherols** (Vitamin E) |

https://www.fda.gov/food/food-ingredients-packaging/overview-food-ingredients-additives-colors

34.     Ascorbic acid is also listed on the FDA's regulatory listing of chemical preservatives. *See* 21 CFR § 182.3013 (Subpart D).

35.     The online magazine livestrong.com explains how ascorbic acid functions as a preservative:

> Preservatives are divided into three categories: Antimicrobials, antioxidants and ascorbic acid.  Antimicrobials prevent bacterial, mold and yeast development.  Antioxidants preserve fats, keeping them from going rancid.  Ascorbic acid falls in the third group as a preservative that stops foods from continuing to ripen, an aging process that leads to decay.

**Preserving Properties**

14

Ascorbic acid neutralizes oxygen when it comes into contact with it.  Oxygen allows foods to continue to ripen, an aging process similar to the one people go through that ends in death.  Oxygen is also vital for many microorganisms to thrive, some of which cause decay.  Ascorbic acid slows or neutralizes these events. The substance blocks cured meat's propensity to form carcinogens called nitrosamines, for example.  In the process, is also preserves the flesh's red color. In addition, ascorbic acid preserves flavor.

**Food-Preservation Mechanism**

Canned vegetables, bottled juices, jams and other preserved fruit are processed foods manufacturers protect with ascorbic acid.  The ingredient's acidity makes it hard for the enzyme phenolase to act.  Phenolase accelerates oxidation, a chemical process in which oxygen level rises, resulting in decay.  This is also the process that ascorbic acid combats.[5]

36.     Citric acid's nature as a preservative is also acknowledged by insiders in the preservative manufacturing and distribution industries.  FBC Industries, Inc. a producer and supplier of FCC grade citric acid additives, acidulants, buffering agents and preservatives for the food and beverage industry describes citric acid's function: "Citric acid is the most commonly used acidulant in the industry.  As a food additive or food grade product, citric acid is used as a flavoring and preservative.  The buffering properties of citrates are used to control pH and flavor."[6]

37.     The FDA's Warning Letter to the manufacturer of the Chiquita brand "Pineapple Bites with Coconut" and "Pineapple Bites" dated October 6, 2010 further confirms that citric acid and ascorbic acid are preservatives:

"The 'Pineapple Bites' and 'Pineapple Bites with Coconut' products are further misbranded within the meaning of section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the chemical preservative ascorbic acid and citric acid but their labels fail to declare these preservatives with a description of their functions.  21 CFR 101.22."

 *See* Exhibit C, FDA Warning Letter dated October 6, 2010.

---

[5] https://www.livestrong.com/article/496950-is-ascorbic-acid-a-preservative/
[6] https://fbcindustries.com/citrates/

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

38.     As described above in ¶¶ 29, 33, a preservative as defined by the FDA is a substance that "tends" to prevent or retard the deterioration of foods.  Thus, it is not necessary that it function as a preservative in every single instance for it to qualify as a preservative according to the FDA's definition, so long as this is its general tendency.

39.     Potassium sorbate is widely used as a preservative in foods and drinks.  It is an odorless and tasteless salt synthetically produced from sorbic acid and potassium hydroxide. Potassium sorbate prolongs the shelf life of food by stopping the growth of mold, yeast, and fungi.

40.     Tocopherols are also listed on the FDA's regulatory listing of chemical preservatives. *See* 21 CFR § 182.3890 (Subpart D).

41.     The FDA's Warning Letter to Wonder Natural Food Corp. dated July 13, 2015 further confirms that tocopherols are preservatives:

> We note that the label bears the claim "No Preservatives."  We note that if any ingredients such as tocopherol or sodium ascorbate are being used as preservatives, this statement would be false and cause the product to be misbranded under 403(a)(l).

 *See* Exhibit D, Warning Letter dated July 13, 2015.

42.     Ascorbic acid, citric acid, potassium sorbate, and tocopherols do as a matter of fact function as preservatives in the Products.

43.     Defendants' Products contain the following non-exhaustive list of additional artificial, chemical, and/or synthetic preservatives, sweeteners, flavors, and colors.

a.  **Beta-Carotene** is a color additive that can be prepared synthetically or obtained from natural sources according to FDA regulations.  21 C.F.R. 73.95.  On information and belief, Plaintiff alleges that the beta-carotene added to Defendant's Products is synthetic.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

b.  **Blue 1** is a synthetic organic compound used as a blue colorant for processed foods, medications, dietary supplements, and cosmetics.

c.  **Calcium Disodium Edta** is an artificial food additive, used as a preservative and flavoring agent.  It is used in food to preserve flavor, color and texture.

d.  **Canola Oil** is a synthetic additive that acts as a preservative because it prevents ingredients from separating, which in turn, stops the food from breaking down and spoiling.  It is a vegetable oil derived from the canola plant.  Canola seed processing involves synthetic chemicals that help extract the oil.  Aside from vitamins E and K, canola oil is not a good source of nutrients.  Canola oil may contain small amounts of trans fats, which is harmful to health.  For the most part, canola oil is highly refined through chemical treatment and GMO.  It is also a rich source of omega-6 fats, which could contribute to inflammation if heavily consumed.

e.  **Cellulose** is an artificial food preservative that, according to federal regulations, is a synthetic substance.  *See* 7 C.F.R. 205.605(b).  The Products contain other types of cellulose such as **powdered cellulose** and **microcrystalline cellulose**, both of which are also classified as synthetic substances according to federal regulations.  *See* 7 C.F.R. 205.605(b).

f.  **Folic Acid** is the synthetic form of folate that is used as a preservative in fortified foods, such as rice, pasta, bread, and cereals.

g.  **Glycerol Ester of Woods Rosin** is an artificial food additive.  Glycerol ester of wood rosin is a complex mixture of glycerol di- and tri- esters of resin acids from wood rosin, with a residual fraction of glycerol monoesters.  It gives a more authentic flavor to fruit-flavored water-based drinks.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

h. **Glycerin** is used in food generally as a preservative, but it is also added to enhance flavor.  Glycerin is a synthetic substance according to federal regulations.  *See* 7. C.F.R. 205.603(a)(12), 7 C.F.R. § 205.605(b).  The glycerin used in Defendant's products is not "natural" but instead, upon information and belief, is manufactured through saponification, whereby fact molecules in vegetable oil are chemically altered using sodium hydroxide, a highly toxic chemical.

It requires multiple processing steps in an industrial environment to create Glycerin.  Therefore, it cannot be described as "natural."  A technical evaluation report compiled by the USDA AMS Agricultural Analytics Division for the USDA National Organic Program explains that Glycerin is "produced by a hydrolysis of fats and oils" and is listed in the USDA Organic Program's National List as a "synthetic nonagricultural (nonorganic) substance."[7]

i. **High Fructose Corn Syrup (HFCS)** is an artificial sweetener used in foods.  It is cheaper and sweeter than sugar, and it is much more quickly absorbed by the body.  Eating too much high fructose corn syrup can lead to insulin resistance, obesity, type 2 diabetes and high blood pressure.

j. **Malic Acid** is a synthetic chemical flavoring compound.  The malic acid in the Products is an inexpensive synthetic chemical used in processed foods to make them taste like tangy fresh fruits.  There is a different naturally-occurring form of malic acid found in some fruits and vegetables.  Defendant does not use this type of malic acid; it instead

---

[7]https://www.ams.usda.gov/sites/default/files/media/Glycerin%20Petition%20to%20remove%20TR%202013.pdf

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

adds a synthetic industrial chemical called d-1 malic acid[8], in the form of a racemic

mixture of d- ad 1-isomers, to flavor the Products artificially.

This type of "malic acid" is not naturally-occurring but is in fact manufactured in

petrochemical plants from benzene or butane – components of gasoline and lighter fluid,

respectively – through a series of chemical reactions, some of which involve highly toxic

chemical precursors and byproducts.

k. **Phosphoric Acid.**  Phosphoric acid is a preservative.  The American Beverage

Association states of phosphoric acid "[t]his flavoring agent in soft drinks is a

preservative that provides tartness."[9]

The Encyclopedia of Food and Color Additives explains the uses of phosphoric acid:

> "Use as a flavor enhancer, flavoring agent, pH control agent, sequestrant,
> stabilizer and thickener, and synergist."  The Encyclopedia explains that
> phosphoric acid is "used as an acidulant, PH control agent, buffering
> agent, flavor enhancer, flavoring agent, sequestrant, stabilizer and
> thickener, and synergist. It works effectively to reduce the pH in many
> food products allowing antimicrobial agents to be more effective."[10]

Scholarly sources confirm that consumer concerns about a preservative like phosphate is

well justified:

> the amount of total phosphate ingestion can be significantly augmented by
> the consumption of processed food and drinks, as phosphate metabolites
> are used as additives in these commercially processed food and drinks.  In
> recent years, the amount of phosphate intake increased worldwide,
> especially in countries with a high consumption of processed food.
> Increased use of phosphate as a preservative has significantly increased in
> a wide range of drinks and food, complicating the patients' ability to
> minimize phosphate intake.  Recent experimental studies have

---

[8] D-malic acid is also called d-hydroxybutanedioic acid or (R)-(+)-2-Hydroxysuccinic acid.
[9] https://www.ameribev.org/education-resources/beverage-dictionary/
[10] Burdock, G. A. (1997). Encyclopedia of Food and Color Additives. Boca Raton, Fla.: CRC
Press.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

convincingly demonstrated the risk of increase serum phosphate levels in the development of premature ageing to reno-vascular diseases.[11]

l.  **Red 40** is an artificial food coloring that is found in highly processed foods.

m.  **Sodium Acid Pyrophosphate** is a synthetic, edible phosphoric salt.  It is a white mass or free-flowing powder that is used in self-rising and prepared baked goods as a preservative to control the pH amounts in food.

n.  **Sodium Aluminum Phosphate** can occur naturally in food, but people are mainly exposed through food additives.  Aluminum can accumulate and persist in the human body, particularly in bone.  Additives containing sodium aluminum phosphate are used as preservatives in many processed foods to help preserve structure.  Animals exposed to aluminum in the womb and during development show neurological effects such as changes in behavior, learning and motor response.  Neurotoxicity has occurred in people undergoing dialysis who received large intravenous doses of unpurified water, but a direct link between aluminum food additives and neurological effects has not been proven.  A link with Alzheimer's disease and other neurodegenerative disorders has been proposed, but the association remains unclear.[12]

o.  **Sodium Benzoate** is a preservative.  It is a synthetic chemical produced when benzoic acid is combined with sodium hydroxide.  While it is generally recognized as safe in small doses, sodium benzoate may cause harmful health effects under certain conditions.

---

[11] Shutto, Y., Shimada, M., Kitajima, M., Yamabe, H., & Razzaque, M. S. (2011). Lack of Awareness among Future Medical Professionals about the Risk of Consuming Hidden Phosphate-Containing Processed Food and Drinks. PLoS ONE, 6(12), e29105. https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0029105
[12] https://www.ewg.org/research/ewg-s-dirty-dozen-guide-food-additives/food-additive-watch-list

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

p. **Sodium Citrate** is used as a preservative and food additive.  It is a recognized synthetic chemical under federal regulations.  *See* 7 C.F.R. §205.605(b).  It is usually prepared by reacting sodium carbonate or sodium hydroxide with citric acid, or by reacting sodium sulfate with calcium citrate.

q. **Sorbitan Monostearate** is a synthetic flavoring substance according to federal regulations.  21 C.F.R. 172.515.  It is a synthetic ester that is commonly used in the manufacture of food and health care products as a surfactant with emulsifying, dispersing, and wetting properties.  It is used in yeast manufacturing to protect the yeast from excess drying and also helps rehydrate the yeast cells.  Sorbitan monostearate is a synthetic additive that also acts as a preservative because it prevents the food from breaking down and spoiling.

r. **Thiamine Mononitrate** is a chemical additive according to federal regulations.  21 C.F.R. 184.1878.  It is added to food to preserve nutrient content during processing.  It is the mononitrate salt of thiamine.  It occurs as white crystals or a white crystalline powder and is prepared from thiamine hydrochloride by dissolving the hydrochloride salt in alkaline solution followed by precipitation of the nitrate half-salt with a stoichiometric amount of nitric acid.

s. **Xanthan Gum** is a thickening agent that, according to federal regulations, is a synthetic substance.  *See* 7 C.F.R. 205.605(b).  Xanthan gum is not "natural" but is instead manufactured through fermentation or carbohydrates and subsequent treatment of the byproduct with isopropyl alcohol.  It is a synthetic additive that acts as a preservative because it prevents ingredients from separating, which in turn, stops the food from

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

breaking down and spoiling.  Xanthan gum can also be used as a carrier of preservative solution (citric and ascorbic acid).

t.   **Yeast Extract** has replaced monosodium glutamate, or MSG, as a taste-booster in most processed foods because it appears to be a natural ingredient on food labels.  However, yeast extract contains the same concentrated free glutamic acid as MSG.  MSG is a synthetically derived and highly concentrated flavor enhancer that is almost completely made up of glutamates.  Research has found that although the FDA does not prohibit the use of yeast extract, even when the name is used to disguise the presence of MSG, the quantity of free glutamate it contains poses problems for MSG-sensitive individuals who experience its effects as toxic.

44.      No product representing that it is "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources should contain any of these ingredients.  And yet, the Products contain the following, non-exhaustive list of artificial, chemical, and/or synthetic preservatives, sweeteners, flavors, and colors.

| **Product** | **Artificial Preservatives, Sweeteners, Flavors, And Color Ingredients** |
|---|---|
| Saint Louis Bread Co. Brioche Roll | Thiamine Mononitrate<br>Folic Acid<br>Citric Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Classic White Bread | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate |
| Saint Louis Bread Co. Sea Salt Focaccia | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Canola Oil<br>Sorbitan Monostearate |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | |
|---|---|
| Saint Louis Bread Co. French Baguette | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate |
| Saint Louis Bread Co. Asiago Cheese | Thiamine Mononitrate<br>Folic Acid<br>Powdered Cellulose<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Microcrystalline Cellulose |
| Saint Louis Bread Co. Cinnamon Raisin Swirl | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Sourdough | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Microcrystalline Cellulose |
| Saint Louis Bread Co. Tomato Basil | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Sprouted Grain Roll | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Honey Wheat | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate |
| Saint Louis Bread Co. Asiago Cheese Focaccia | Thiamine Mononitrate<br>Folic Acid<br>Powdered Cellulose<br>Ascorbic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Country Rustic | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Microcrystalline Cellulose |
| Saint Louis Bread Co. Farmstyle XL Loaf | Thiamine Mononitrate<br>Folic Acid |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | |
|---|---|
| | Sorbitan Monostearate<br>Ascorbic Acid<br>Microcrystalline Cellulose |
| Saint Louis Bread Co. Whole Grain | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Microcrystalline Cellulose |
| Saint Louis Bread Co. Artisan Ciabatta | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Ascorbic Acid<br>Sorbitan Monostearate |
| Saint Louis Bread Co. Chocolate Croissant | Thiamin Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Citric Acid<br>Xanthan Gum,<br>Malic Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Cheese Brittany | Thiamine Mononitrate<br>Folic Acid<br>Flavor<br>Xanthan Gum<br>Ascorbic Acid<br>Citric Acid<br>Malic Acid |
| Saint Louis Bread Co. Pecan Braid | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Bear Claw | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Citric Acid<br>Beta-Carotene<br>Cellulose<br>Ascorbic Acid |
| Saint Louis Bread Co. Cherry Cheese Brittany | Thiamine Mononitrate<br>Folic Acid<br>Xanthan Gum<br>Ascorbic Acid<br>Citric Acid<br>Malic Acid |
| Saint Louis Bread Co. Croissant | Thiamin Mononitrate<br>Folic Acid |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

|  |  |
|---|---|
|  | Ascorbic Acid<br>Citric Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Almond Croissant | Thiamin Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Citric Acid<br>Xanthan Gum<br>Glycerin |
| Saint Louis Bread Co. Pastry Ring | Thiamine Mononitrate<br>Folic Acid)<br>Citric Acid<br>Malic Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Vanilla Cinnamon Roll | Thiamine Mononitrate<br>Folic Acid<br>Beta-Carotene<br>Ascorbic Acid |
| Saint Louis Bread Co. Apple Pie Thumbprint Cookie | Thiamine Mononitrate<br>Folic Acid<br>Citric Acid |
| Saint Louis Bread Co. Heart Cookie | Thiamine Mononitrate<br>Folic Acid<br>Citric Acid |
| Saint Louis Bread Co. Kitchen Sink Cookie | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil |
| Saint Louis Bread Co. Oatmeal Raisin with Berries Cookie | Thiamine Mononitrate<br>Folic Acid<br>Cellulose<br>Citric Acid |
| Saint Louis Bread Co. Candy Cookie | Thiamine Mononitrate<br>Folic Acid |
| Saint Louis Bread Co. Petite Chocolate Chipper | Thiamine Mononitrate<br>Folic Acid |
| Saint Louis Bread Co. Chocolate Chipper Cookie | Thiamine Mononitrate<br>Folic Acid |
| Saint Louis Bread Co. Cocoa & Crème Cookie | Thiamine Mononitrate<br>Folic Acid<br>Citric Acid |
| Saint Louis Bread Co. Homestyle Chocolate Chunk Cookie | Thiamine Mononitrate<br>Folic Acid |
| Saint Louis Bread Co. Lemon Drop Cookie | Thiamine Mononitrate<br>Folic Acid |
| Saint Louis Bread Co. Blueberry Muffin with Fresh Blueberries | Thiamine Mononitrate<br>Folic Acid |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | Citric Acid<br>Sodium Acid Pyrophosphate |
|---|---|
| Saint Louis Bread Co. Pumpkin Muffin | Thiamine Mononitrate<br>Folic Acid<br>Sodium Aluminum Phosphate<br>Thiamine Mononitrate |
| Saint Louis Bread Co. Cranberry Orange Muffin | Mononitrate<br>Folic Acid<br>Citric Acid<br>Sodium Acid Pyrophosphate |
| Saint Louis Bread Co. Chocolate Chip Muffie | Thiamine Mononitrate<br>Folic Acid<br>Sodium Acid Pyrophosphate |
| Saint Louis Bread Co. Pumpkin Muffie | Thiamine Mononitrate<br>Folic Acid<br>Sodium Aluminum Phosphate |
| Saint Louis Bread Co. Apple Cinnamon Crunch Scone | Thiamine Mononitrate<br>Folic Acid<br>Sodium Acid Pyrophosphate<br>Citric Acid |
| Saint Louis Bread Co. Blueberry Scone | Thiamine Mononitrate<br>Folic Acid<br>Sodium Acid Pyrophosphate<br>Monocalcium Phosphate |
| Saint Louis Bread Co. Cinnamon Crunch Scone | Thiamine Mononitrate<br>Folic Acid<br>Sodium Acid Pyrophosphate<br>Monocalcium Phosphate |
| Saint Louis Bread Co. Orange Scone | Thiamine Mononitrate<br>Folic Acid<br>Sodium Acid Pyrophosphate<br>Monocalcium Phosphate |
| Saint Louis Bread Co. Brownie | Thiamine Mononitrate<br>Folic Acid |
| Saint Louis Bread Co. Cinnamon Crum Coffee Cake | Thiamine Mononitrate<br>Folic Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Sprouted Grain Bagel Flat | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Everything Bagel | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | |
|---|---|
| Saint Louis Bread Co. Plain Bagel | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Chocolate Chip Bagel | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Whole Grain Bagel | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. French Toast Bagel | Thiamine Mononitrate<br>Folic Acid<br>Beta Carotene<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Sesame Bagel | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Cinnamon Crunch Bagel | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Asiago Cheese Bagel | Thiamine Mononitrate<br>Folic Acid<br>Powdered Cellulose<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Powdered Cellulose |
| Saint Louis Bread Co. Cinnamon Swirl & Raisin Bagel | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Blueberry Bagel | Thiamine Mononitrate<br>Folic Acid<br>Citric Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Maple Bacon, Scrambled Eggs & Cheese Wrap | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Ascorbic Acid<br>Citric Acid<br>Canola Oil |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | Xanthan Gum |
|---|---|
| Saint Louis Bread Co. Chipotle Chicken, Scrambled Eggs & Avocado | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Ascorbic Acid<br>Citric Acid<br>Yeast Extract<br>Xanthan Gum |
| Saint Louis Bread Co. Mediterranean Egg White Wrap | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Ascorbic Acid,<br>Citric Acid |
| Saint Louis Bread Co. Bacon, Egg & Cheese | Thiamine Mononitrate<br>Folic Acid<br>Citric Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Canola Oil |
| Saint Louis Bread Co. Bacon, Scrambled Egg & Cheese on Ciabatta | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Citric Acid |
| Saint Louis Bread Co. Sausage, Egg & Cheese | Thiamine Mononitrate<br>Folic Acid<br>Citric Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Canola Oil |
| Saint Louis Bread Co. Egg & Cheese | Thiamine Mononitrate<br>Folic Acid<br>Citric Acid<br>Sorbitan Monostearate,<br>Ascorbic Acid<br>Canola Oil |
| Saint Louis Bread Co. Ham, Egg & Cheese | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Microcrystalline Cellulose<br>Canola Oil |
| Saint Louis Bread Co. Steak & Egg | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

|  |  |
|---|---|
|  | Ascorbic Acid<br>Canola Oil |
| Saint Louis Bread Co. Avocado, Egg White & Spinach | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Spinach & Bacon Souffle | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sodium Citrate<br>Citric Acid<br>Powdered Cellulose |
| Saint Louis Bread Co. Ham & Swiss Souffle | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sodium Citrate<br>Citric Acid |
| Saint Louis Bread Co. Bistro French Onion Soup | Citric Acid<br>Yeast Extract<br>Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Powdered Cellulose |
| Saint Louis Bread Co. Baked Potato Soup | Yeast Extract |
| Saint Louis Bread Co. Broccoli Cheddar Soup | Sodium Citrate<br>Yeast Extract<br>Canola Oil |
| Saint Louis Bread Co. Vegetarian Creamy Tomato Soup | Citric Acid<br>Canola Oil<br>Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Turkey Chili | Citric Acid]<br>Yeast Extract<br>Xanthan Gum |
| Saint Louis Bread Co. Vegetarian Autumn Squash Soup | Yeast Extract<br>Rosemary Extract<br>Canola Oil |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | |
|---|---|
| Saint Louis Bread Co. Ten Vegetable Soup | Yeast Extract<br>Citric Acid |
| Saint Louis Bread Co. Low-Fat Chicken Soup | Yeast Extract<br>Xanthan Gum |
| Saint Louis Bread Co. Modern Greek Salad with Quinoa | Canola Oil<br>Xanthan Gum<br>Citric Acid |
| Saint Louis Bread Co. Caesar Salad | Xanthan Gum<br>Citric Acid<br>Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Caesar Salad with Chicken | Citric Acid<br>Malic Acid<br>Xanthan Gum<br>Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Greek Salad | Xanthan Gum<br>Citric Acid<br>Canola Oil |
| Saint Louis Bread Co. Green Goddess Cobb Salad with Chicken | Citric Acid<br>Malic Acid<br>Canola Oil<br>Ascorbic Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Southwest Chile Lime Ranch Salad with Chicken | Citric Acid<br>Malic Acid<br>Canola Oil<br>Yeast Extract<br>Xanthan Gum<br>Ascorbic Acid |
| Saint Louis Bread Co. Spicy Thai Salad with Chicken | Citric Acid<br>Malic Acid<br>Canola Oil<br>Xanthan Gum |
| Saint Louis Bread Co. Fuji Apple Salad with Chicken | Citric Acid<br>Malic Acid<br>Xanthan Gum<br>Canola Oil<br>Ascorbic Acid |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | |
|---|---|
| Saint Louis Bread Co. Seasonal Greens Salad | Xanthan Gum |
| Saint Louis Bread Co. Asian Sesame Salad with Chicken | Citric Acid<br>Malic Acid<br>Xanthan Gum<br>Canola Oil |
| Saint Louis Bread Co. Baja Grain Bowl with Chicken | Citric Acid<br>Malic Acid<br>Canola Oil |
| Saint Louis Bread Co. Baja Grain Bowl | Canola Oil |
| Saint Louis Bread Co. Mediterranean Grain Bowl with Chicken | Canola Oil<br>Citric Acid<br>Malic Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Mediterranean Grain Bowl | Canola Oil<br>Citric Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Baja Mac & Cheese | Thiamine Mononitrate<br>Folic Acid<br>Sodium Citrate<br>Thiamine Mononitrate<br>Folic Acid<br>Xanthan Gum<br>Canola Oil |
| Saint Louis Bread Co. BBQ Chicken Mac & Cheese | Thiamine Mononitrate<br>Folic Acid<br>Sodium Citrate<br>Xanthan Gum<br>Yeast Extract,<br>Citric Acid |
| Saint Louis Bread Co. Mac & Cheese | Thiamine Mononitrate<br>Folic Acid<br>Sodium Citrate<br>Xanthan Gum |
| Saint Louis Bread Co. Chicken Tortellini Alfredo | Thiamine Mononitrate<br>Folic Acid<br>Powdered Cellulose<br>Canola Oil<br>Yeast Extract |
| Saint Louis Bread Co. Sierra Turkey | Thiamine Mononitrate<br>Folic Acid<br>Powdered Cellulose<br>Ascorbic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Yeast Extract |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | Xanthan Gum |
|---|---|
| Saint Louis Bread Co. Chipotle Chicken Avocado Melt | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Yeast Extract<br>Xanthan Gum<br>Ascorbic Acid |
| Saint Louis Bread Co. Toasted Frontega Chicken | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Yeast Extract<br>Xanthan Gum |
| Saint Louis Bread Co. Toasted Steak & White Cheddar | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Xanthan Gum |
| Saint Louis Bread Co. Tuna Salad Sandwich | Xanthan Gum<br>Mixed Tocopherols<br>Canola Oil<br>Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Modern Caprese Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Citric Acid |
| Saint Louis Bread Co. Roasted Turkey, Apple & Cheddar Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Canola Oil<br>Xanthan Gum<br>Citric Acid |
| Saint Louis Bread Co. Turkey Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | Sorbitan Monostearate<br> Microcrystalline Cellulose<br>Canola Oil |
|---|---|
| Saint Louis Bread Co. Mediterranean Veggie Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Canola Oil<br>Citric Acid |
| Saint Louis Bread Co. Steak & Arugula Sandwich | Canola Oil<br>Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Microcrystalline Cellulose<br>Xanthan Gum<br>Citric Acid |
| Saint Louis Bread Co. Napa Almond Chicken Salad Sandwich | Citric Acid<br>Malic Acid<br>Xanthan Gum<br>Ascorbic Acid<br>Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Microcrystalline Cellulose<br>Canola Oil |
| Saint Louis Bread Co. The Cuban | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Xanthan Gum |
| Saint Louis Bread Co. Bacon Tomato Grilled Cheese | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Microcrystalline Cellulose<br>Sodium Citrate |
| Saint Louis Bread Co. Classic Grilled Cheese | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sodium Citrate |
| Saint Louis Bread Co. Heritage Ham & Swiss Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | |
|---|---|
| | Microcrystalline Cellulose<br>Citric Acid<br>Xanthan Gum |
| Saint Louis Bread Co. Toasted Tuscan Grilled Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Citric Acid<br>Malic Acid<br>Xanthan Gum<br>Citric Acid |
| Saint Louis Bread Co. Roasted Turkey & Avocado BLT | Canola Oil<br>Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Microcrystalline Cellulose |
| Saint Louis Bread Co. Bacon Turkey Bravo Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid<br>Citric Acid<br>Xanthan Gum<br>Canola Oil |
| Saint Louis Bread Co. Kids Mac & Cheese | Thiamine Mononitrate<br>Folic Acid<br>Sodium Citrate<br>Sodium Citrate<br>Xanthan Gum |
| Saint Louis Bread Co. Kids Turkey Chili | Citric Acid<br>Yeast Extract<br>Xanthan Gum |
| Saint Louis Bread Co. Kids Vegetarian Autumn Squash Soup | Yeast Extract |
| Saint Louis Bread Co. Kids Ten Vegetable Soup | Yeast Extract<br>Citric Acid |
| Kids Vegetarian Creamy Tomato Soup | Citric Acid<br>Canola Oil<br>Thiamine Mononitrate<br>Folic Acid<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Kids Baked Potato Soup | Yeast Extract |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | |
|---|---|
| Saint Louis Bread Co. Kids Low-Fat Chicken Noodle Soup | Yeast Extract<br>Xanthan Gum |
| Saint Louis Bread Co. Kids Bistro French Onion Soup | Citric Acid<br>Yeast Extract<br>Powdered Cellulose<br>Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Kids Broccoli Cheddar Soup | Sodium Citrate<br>Yeast Extract |
| Saint Louis Bread Co. Kids Seasonal Greens Salad | Xanthan Gum |
| Saint Louis Bread Co. Kids Greek Salad | Xanthan Gum<br>Citric Acid<br>Canola Oil |
| Saint Louis Bread Co. Kids Caesar Salad | Xanthan Gum<br>Citric Acid<br>Thiamine Mononitrate<br>Folic Acid<br>Canola Oil<br>Sorbitan Monostearate<br>Ascorbic Acid |
| Saint Louis Bread Co. Kids Turkey Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Microcrystalline Cellulose<br>Sodium Citrate |
| Saint Louis Bread Co. Kids Peanut Butter & Jelly | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Microcrystalline Cellulose<br>Citric Acid |
| Saint Louis Bread Co. Kids Grilled Cheese | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Sodium Citrate |
| Saint Louis Bread Co. Kids Artisan Ham Sandwich | Thiamine Mononitrate<br>Folic Acid<br>Ascorbic Acid<br>Sorbitan Monostearate<br>Microcrystalline Cellulose |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| | Sodium Citrate |
|---|---|
| Saint Louis Bread Co. Frozen Caramel Cold Brew | Sorbitan Monostearate |
| Saint Louis Bread Co. Frozen Mocha Cold Brew | Xanthan Gum<br>Citric Acid<br>Sorbitan Monostearate |
| Saint Louis Bread Co. Peach & Blueberry Smoothie with Almond Milk | Potassium Citrate |
| Saint Louis Bread Co. Cold Brew – Madagascar Vanilla Cream | Citric Acid |
| Saint Louis Bread Co. Iced Madagascar Vanilla Latte | Citric Acid<br>Sorbitan Monostearate |
| Saint Louis Bread Co. Iced Chai Tea Latte | Citric Acid |
| Saint Louis Bread Co. Lipton Brisk Raspberry Tea | Citric Acid<br>Potassium Sorbate<br>Sodium Benzoate<br>Red 40 |
| Saint Louis Bread Co. Passion Papaya Green Tea | Citric Acid<br>Ascorbic Acid<br>Beta Carotene |
| Saint Louis Bread Co. Blood Orange Lemonade | Citric Acid |
| Saint Louis Bread Co. Iced Caffe Mocha | Xanthan Gum<br>Citric Acid<br>Sorbitan Monostearate |
| Saint Louis Bread Co. Tropical Fruit Punch | High Fructose Corn Syrup<br>Citric Acid<br>Potassium Citrate<br>Phosphoric Acid<br>Potassium Sorbate<br>Red 40<br>Glycerol Ester Of Wood Rosin<br>Calcium Disodium Edta<br>Blue 1 |
| Saint Louis Bread Co. Iced Caramel Latte | Sorbitan Monostearate |
| Saint Louis Bread Co. Signature Hot Chocolate | Xanthan Gum<br>Citric Acid<br>Sorbitan Monostearate<br>Glycerin |
| Saint Louis Bread Co. Caffe Mocha | Xanthan Gum<br>Citric Acid<br>Sorbitan Monostearate |
| Saint Louis Bread Co. Caramel Latte | Sorbitan Monostearate |

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

| Saint Louis Bread Co. Skinny Caffe Mocha | Xanthan Gum Citric Acid |
|---|---|
| Saint Louis Bread Co. Chai Tea Latte | Citric Acid |
| Saint Louis Bread Co. Madagascar Vanilla Latte | Citric Acid Sorbitan Monostearate |

45.     Given the presence of these artificial, chemical and/or synthetic preservatives, sweeteners, flavors, and colors in the Products, Defendants' representations that they are "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources are false and misleading.

46.     Saint Louis Bread Co.'s Products thus are not "100% clean" and/or "clean," and marketing, advertising, or labeling the Products as such is misleading and deceptive.

47.     No serious contention can be made that Products containing artificial, chemical and/or synthetic preservatives, sweeteners, flavors, and/or colors are "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources.

**Defendants Have Deceived Consumers and Are Aware That Their Representations Were False**

48.     Defendants knew, or should have known, that the Products contain artificial preservatives, sweeteners, flavors, or colors from artificial sources and were not "clean."

49.     Defendants hold themselves out to the public as a trusted expert in the production of "clean' food.

50.     Defendants know what representations they make regarding the Products.

51.     Defendants know how the Products are produced, including what artificial, chemical and/or synthetic preservatives, sweeteners, flavors, or colors are used as ingredients in the Products.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

52.     The existence of the artificial preservatives, sweeteners, flavors, or colors from artificial sources in the Products is known to Defendants.

53.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is "clean", especially at the point-of-sale.  Consumers would not know the true nature of the ingredients merely by reading the ingredients list on Panera's website or those listed in some stores.

54.     Discovering that the ingredients are not "clean" and contain artificial preservatives and additives requires a scientific investigation and knowledge of chemistry beyond that of the average consumer.  That is why, even though all of the ingredients listed above are identified on Panera's website and in some stores, the reasonable consumer would not understand – nor are they expected to understand - that these ingredients are artificial, chemical and/or synthetic preservatives, sweeteners, flavors, or colors.

55.     Moreover, the reasonable consumer is not expected or required to scour the ingredients list on Panera's website in order to confirm or debunk Defendants' prominent claims and representations that the Products are "100% clean" and/or "clean."

56.     Defendants did not disclose that any of the ingredients listed above are artificial, chemical and/or synthetic preservatives, sweeteners, flavors, or colors.  A reasonable consumer understands Defendant's "100% clean" and/or "clean" claims to mean exactly what Defendants say they mean – that they Products do not contain any artificial preservatives, sweeteners, flavors, or colors from artificial sources.

57.     Reasonable consumers are misled and deceived by Defendants' "clean" representations into believing that they are purchasing Products that are "clean," with no artificial preservatives, sweeteners, flavors, or colors from artificial sources.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

58.     Defendants made these false, misleading, and deceptive representations, and omitted the information that would counter them.

59.     Upon information and belief, Defendants have profited enormously from consumers in Missouri based on their falsely marketed products.

60.     Saint Louis Bread Co. has misrepresented that the Products are "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources and concealed and suppressed information about the artificial, chemical and/or synthetic preservatives, sweeteners, flavors, or colors in the Products.

61.     Saint Louis Bread Co.'s representations that the Products are "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors when, in fact, they are not, is a material fact.

62.     Saint Louis Bread Co. has failed to adequately inform or warn Plaintiff of the artificial, chemical and/or synthetic preservatives, sweeteners, flavors, or colors in the Products.

63.     To this day, Saint Louis Bread Co. continues to misrepresent, conceal, and suppress information about the artificial, chemical and/or synthetic preservatives, sweeteners, flavors, or colors in the Products in its marketing, advertising and communications with purchasers.

**The Class**

64.     Plaintiff and the Class purchased the Saint Louis Bread Co. Products, which were falsely represented as set forth above, primarily for personal, family and/or household purposes and thereby suffered an ascertainable loss of money or property as a result of Saint Louis Bread Co.'s practices declared unlawful by Missouri's Merchandising Practices Act, because the

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

products Plaintiff and the other Class Members purchased were worth less than the product they thought they had purchased had Saint Louis Bread Co.'s representations been true.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff and Class Members hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Petition.

66.     Plaintiff brings this action under Rule 52.08 of the Missouri Rules of Civil Procedure and Missouri Revised Statutes §§407.025.2 and 407.025.3, on behalf of himself and a class defined as follows:

> **All Missouri citizens who, within the five years preceding the filing of this Petition, purchased the Saint Louis Bread Co. Products for personal, family or household use.**

Excluded from the Class:

   i.   Defendants, any entity in which a Defendant has a controlling interest or which has a controlling interest in a Defendant, and Defendants' legal representatives, predecessors, successors, assigns, and employees;

   ii.   Counsel and members of the immediate family of counsel for Plaintiff herein; and

   iii.   The judge and staff to whom this case was assigned, and any member of the judge's immediate family; and

   iv.   Individuals claiming they have suffered a personal injury as a result of using the Products.

67.     Plaintiff reserves the right to revise this definition of the Class based on facts they learn during discovery.

68.     The proposed Class meets all requirements for class certification.  The Plaintiff's Class satisfies the numerosity standards.  Plaintiff has a good faith belief that there are thousands of Class Members in the State of Missouri.  As a result, joinder of all Class Members in a single

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

action is impracticable.  Class Members may be informed of the pendency of this Class Action by published and broadcast notice.

69.     Plaintiff's claims are typical of the other Class Members.  Plaintiffs and Class Members purchased the Saint Louis Bread Co. Products in the State of Missouri in connection with Defendants' violations of the Missouri Merchandising Practices Act.  Plaintiff and Class Members have all sustained damages in that each paid the purchase price for the Products.

70.     Plaintiff is an adequate representative of the Class because he is a member of the Class and his interests do not conflict with the interests of the members of the Class he seeks to represent.  The interests of Class Members will be fairly and adequately protected by Plaintiff and his undersigned counsel, who have extensive experience prosecuting complex class action litigation.

71.     Common questions of law and/or fact exist as to all Class Members, which predominate over any questions affecting solely individual Class Members.  The questions of law and fact common to the Class arising from Saint Louis Bread Co.'s actions include, without limitation, the following:

a.   Whether, in marketing and selling the Products, Saint Louis Bread Co. misrepresented that the Products are "100% clean" and/or "clean" with no artificial preservatives, sweeteners, flavors, or colors from artificial sources and concealed and/or suppressed information about the artificial, chemical and/or synthetic preservatives, sweeteners, flavors, or colors in the Products;

b.   Whether Saint Louis Bread Co. misrepresented in its advertisements, marketing materials, labeling, website statements, and public statements, among other things, that the Products are "100% clean" and/or "clean" with

no artificial preservatives, sweeteners, flavors, or colors from artificial
sources;

c.   Whether Saint Louis Bread Co. failed to adequately inform or warn Plaintiff
of the artificial, chemical and/or synthetic preservatives, sweeteners, flavors,
or colors in the Products;

d.   Whether Saint Louis Bread Co. knowingly omitted, suppressed, or concealed
material facts about the artificial, chemical and/or synthetic preservatives,
sweeteners, flavors, or colors in the Products from the consuming public.

e.   Whether Saint Louis Bread Co.'s affirmative representations and/or failure to
disclose that the Products contain artificial, chemical and/or synthetic
preservatives, sweeteners, flavors, or colors constitutes deception, fraud, false
pretense, false promise, misrepresentation, unfair practices and omission,
concealment, and suppression of material information in connection with the
sale or advertisement of merchandise in trade or commerce in or from the
State of Missouri;

f.   Whether Saint Louis Bread Co.'s conduct violated the Missouri
Merchandising Practices Act;

g.   Whether Plaintiff and the Class Members have sustained monetary loss and
the proper measure of that loss;

h.   Whether Plaintiff and Class Members are entitled to an award of
compensatory damages;

i.   Whether Plaintiff and Class Members are entitled to an award of punitive
damages as permitted by the Missouri Merchandising Practices Act; and

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

j.   Whether injunctive, declaratory, and/or other equitable relief is warranted.

72.   These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual members of the Class.  The resolution of common questions in this case will resolve the claims of both Plaintiff and the Class.

73.   A class action is superior, with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual Class Members would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and/or fact common to the Class.  In addition, the prosecution of separate actions by individual Class Members would establish incompatible standards of conduct for any party opposing the Class.  Also, the prosecution of separate actions by individual Class Members, if fully adjudicated, as a practical matter, would be dispositive of the interests of the other Class Members not parties to that particular adjudication and, as such, would substantially impair or impede upon those Class Members abilities to protect their interests.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

74.   The interest of Class Members in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through a representative would be unobjectionable.  The amounts at stake for Class Members, while substantial in the aggregate, may not be great enough individually to enable them to maintain separate suits against Defendant.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

75.     Plaintiff seeks a refund of monies paid for the Saint Louis Bread Co. Products.

76.     Plaintiff specifically excludes from this Class Action any damages, losses, or other relief of any kind arising from the personal injuries suffered by Class Members.  This Class Action seeks only economic relief requested herein to which Class Members are entitled under the Missouri Merchandising Practices Act.

77.     Notice can be provided to Class Members by using techniques and forms of notice similar to those customarily used in other consumer product-related cases and complex class actions.

## ALLEGATIONS RELATED TO PUNITIVE DAMAGES

78.     Plaintiff and Class Members hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Petition.

79.     Defendants' unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of the Products were outrageous because of Defendants' evil motive and/or conscious disregard and/or reckless indifference to the rights and/or safety of Plaintiff and Class Members alike.

80.     As a result of Defendants' conduct alleged herein, the jury should be permitted to return a verdict of punitive damages under the Petition that will serve to punish Defendants and deter others from like conduct.  The Missouri Merchandising Practices Act expressly provides for punitive damages.  *See* Mo. Rev. Stat. § 407.025.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**CLAIM FOR RELIEF**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**Mo. Rev. Stat. §§ 407.010, *et seq.***

81.     Plaintiff and Class Members hereby incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Petition.

82.     The acts and practices engaged in by Defendants, and described herein, constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010, *et seq*.

83.     Defendants' actions alleged herein violated, and continue to violate, the MMPA.

84.     Defendants are a "person" within the meaning of the MMPA, at Missouri Revised Statutes § 407.010(5).

85.     The goods purchased from Defendants are "merchandise" within the meaning of the MMPA, Missouri Revised Statutes § 407.010(4).

86.     The transactions resulting in purchases of goods from Defendants in Missouri are a "sale" within the meaning of the MMPA, Missouri Revised Statutes § 407.010(6).

87.     Defendants engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of the Saint Louis Bread Co.'s Products in violation of Mo. Rev. Stat. § 407.020, which states in relevant part as follows:

> 407.020. 1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... is declared to be an unlawful practice. ... Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

88.     Plaintiff and Class Members purchased the Saint Louis Bread Co. Products, products that were falsely represented as "100% clean" and/or "clean" with no artificial

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

preservatives, sweeteners, flavors, or colors from artificial sources, as stated above, in violation of the Missouri Merchandising Practices Act and as a result Plaintiff suffered economic damages, in that the product he and other Class Members purchased was worth less than the product they thought they had purchased had Defendants' representations been true.

89.     At all times relevant herein, Plaintiff was unaware that the Saint Louis Bread Co. Products were not "100% clean" and/or "clean."

90.     At all times relevant herein, Plaintiff was unaware that the Saint Louis Bread Co. Products contained artificial preservatives, sweeteners, flavors, or colors from artificial sources.

91.     Defendants' marketing materials for the Saint Louis Bread Co. Products do not disclose that the Products were not "100% clean" and/or "clean."

92.     Defendants' marketing materials for the Saint Louis Bread Co. Products do not disclose that the Products contain artificial preservatives, sweeteners, flavors, or colors from artificial sources.

93.     Defendant's website does not disclose that the Products were not "100% clean" and/or "clean."

94.     Defendant's website does not disclose that the Products contain artificial preservatives, sweeteners, flavors, or colors from artificial sources.

95.     Defendants' labeling for the Saint Louis Bread Co. Products does not disclose that the Products are not "100% clean" and/or "clean."

96.     Defendants' labeling for the Saint Louis Bread Co. Products does not disclose that the Products contain artificial preservatives, sweeteners, flavors, or colors from artificial sources.

97.     Defendants' point-of-sale materials for the Saint Louis Bread Co. Products do not disclose that the Products are not "100% clean" and/or "clean."

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

98.     Defendants' point-of-sale materials for the Saint Louis Bread Co. Products do not disclose that the Products contain artificial preservatives, sweeteners, flavors, or colors from artificial sources.

99.     Defendants' failure to disclose the fact that the Saint Louis Bread Co. Products were not "100% clean" and/or "clean" as defined by Defendants, was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material omission.

100.     Defendants' failure to disclose the fact that the Saint Louis Bread Co. Products contain artificial preservatives, sweeteners, flavors, or colors from artificial sources was a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material omission.

101.     The foregoing acts and practices of Defendants constituted unfair and unlawful practices, and deceptive conduct, in violation of the Missouri Merchandising Practices Act.

102.     As a direct proximate result of the above-described practices, Plaintiff and Class Members suffered ascertainable loss of money due to the purchasing of the Saint Louis Bread Co. Products.

103.     Appropriate injunctive relief is necessary to prevent Defendants' MMPA violations from continuing.  If Defendants' violations of the MMPA are not stopped by such injunctive relief, Plaintiff and the members of the Class will continue to suffer injury.

104.     The conduct of Defendants was malicious, corrupt, and intentional and/or reckless to a degree sufficient to support an award of punitive damages against Defendants.

105.     WHEREFORE, Plaintiff and the Class pray for the relief requested in the Prayer for Relief set forth below in this Petition.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

## PRAYER FOR RELIEF

106.   WHEREFORE, Plaintiff and each member of the proposed Class pray for a judgment:

(a)  Certifying the Class as requested herein;

(b)  Entering an order appointing Orlowsky Law, LLC and Goffstein Law, LLC as counsel for the Class;

(c)  Returning all purchase costs Plaintiff and the Class paid for the Saint Louis Bread Co. Products;

(d)  Awarding declaratory and injunctive relief as permitted by law or equity including a preliminary and permanent injunction enjoining Defendants from continuing the unlawful practices as set forth herein;

(e)  Awarding punitive damages in an amount to be determined at trial;

(f)  Awarding pre-judgment interest;

(g)  Awarding post-judgment interest;

(h)  Awarding attorneys' fees and costs;

(i)  Providing such further relief as the Court may deem fair and reasonable.

## JURY DEMAND

107.   Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Orlowsky Law, LLC


/s/ Daniel J. Orlowsky
Daniel J. Orlowsky, #57387
Orlowsky Law, LLC
7777 Bonhomme, Suite 1910
St. Louis, Missouri 63105
Phone:  (314) 725-5151
Fax:  (314) 455-7357
dan@orlowskylaw.com

Attorney for Plaintiff



Goffstein Law, LLC


/s/ Adam M. Goffstein
Adam M. Goffstein, #45611
7777 Bonhomme, Suite 1910
St. Louis, Missouri 63105
Phone:  (314) 725-5151
Fax:  (314) 455-7278
adam@goffsteinlaw.com

Attorney for Plaintiff

2022-CC01133

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
ST. LOUIS DIVISION**

| | |
|---|---|
| **MARK BOSWELL and****DAVID LUTTON**, individually, and onbehalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**PANERA BREAD COMPANY** and**PANERA, LLC**,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   **Case No. 4:14-CV-01833-AGF**<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT
FOR DAMAGES AND INJUNCTIVE RELIEF**

Defendants Panera Bread Company and Panera, LLC (collectively, "Defendants"), in response to Plaintiffs' Complaint for Damages and Injunctive Relief, state:

1.     Panera owns and franchises bakery-cafes throughout the United States. The company employed Plaintiffs and the Class as Joint Venture General Managers ("JV GMs") to manage the daily operations of its company-owned cafes.

**ANSWER:     Defendants admit that Defendant Panera, LLC owns, as well as franchises, bakery-cafes throughout the United States.  Defendants further admit that Defendant Panera, LLC employed Plaintiffs Mark Boswell and David Lutton as Joint Venture General Managers who were tasked with supervising the operations of their assigned bakery-café.  Defendants are without information sufficient to form a belief as to the employment of any unnamed "Class" members and therefore deny the same. Defendants further deny the existence of any "Class" and deny all remaining allegations in Paragraph 1.**

# Exhibit A

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

2.     The terms of the employment relationship between Panera and each JV GM were set forth in a standard five-year employment agreement and "Joint Venture General Manager Compensation Plan". Together, these unambiguous contracts comprised the "final, complete, and exclusive agreement between [the JV GM] and Panera with respect to any bonus, incentive plan, or other compensation."

**ANSWER:     Defendants admit that Plaintiffs both entered into an agreement titled "Employment and Confidentiality Agreement" and an agreement titled "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC.  Those agreements speak for themselves.  Defendants are without sufficient information to form a belief as to any agreement that may have been entered into by other unnamed "JV GMs" and therefore deny the same. Whether the contracts are "unambiguous" is a legal conclusion to which no response is required.  Defendants deny all remaining allegations in Paragraph 2.**

3.     These contracts provided that the JV GM would receive a small annual salary for five years, and, at the end of the five-year term, a "one-time JV GM Buyout" payment. The amount of the Buyout was to be determined in accordance with specific provisions set forth in the Plan, which turned on the profitability of the JV GM's cafe. Pursuant to those provisions, the greater the difference between the aggregate profits attributed to a JV GM's cafe and the applicable pre-determined "profit hurdle", the greater the Buyout amount.

**ANSWER:     Defendants admit that Plaintiffs both entered into an agreement titled "Employment and Confidentiality Agreement" and an agreement titled "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC.  Those agreements speak for themselves.  Defendants deny all remaining allegations in Paragraph 3.**

4.     Neither the Plan nor the Agreement placed any limitation on the amount of the Buyout payment, or authorized Panera to reduce the amount of the Buyout payment below the amount required by the Plan. Indeed, the Plan forbade Panera from reducing the amount of any JV GM's Buyout payment without a written modification or waiver of the Buyout provisions of the Plan, signed by the JV GM.

**ANSWER:     Defendants admit that Plaintiffs both entered into an agreement titled "Employment and Confidentiality Agreement" and an agreement titled "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC.  Those agreements speak for themselves.  Defendants deny all remaining allegations in Paragraph 4.**

5.     Panera did not obtain written modifications or waivers of the Plan's Buyout provisions signed by Plaintiffs or other members of the Class. Panera therefore had a contractual obligation to make Buyout payments to each Plaintiff and Class member in the full amount determined in accordance with the provisions of the Plan.

**ANSWER:     Defendants admit that Plaintiffs both entered into an agreement titled "Employment and Confidentiality Agreement" and an agreement titled "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC.  Those agreements speak for themselves.  Defendants are without sufficient information to form a belief as to any agreement or modification that may have been entered into by unnamed "Class Members" and therefore deny the same. Defendants further deny the existence of any "Class" and deny all remaining allegations in Paragraph 5.**

6.     Panera did not do this. Instead, beginning in 2011, Panera unilaterally imposed a "cap" on the Buyout payments it made to JV GMs. The purpose and effect of this action,

3

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

instituted and approved by Panera's senior executives, was to reduce the amount of the Buyout payments it made to Plaintiffs and the Class below the amount required by the Plan.

     <u>**ANSWER:**</u>    **Defendants deny the allegations in Paragraph 6.**

7.    In so doing, Panera enriched itself by depriving these employees of compensation they had bargained for and earned.

     <u>**ANSWER:**</u>    **Defendants deny the allegations in Paragraph 7.**

8.    Panera is liable for its actions, which constitute material breaches of contract, conversion, and fraud.

     <u>**ANSWER:**</u>    **Defendants deny the allegations in Paragraph 8.**

9.    Plaintiffs, individually and on behalf of the proposed Class, bring this action to recover damages and obtain injunctive relief, costs of suit, and reasonable attorneys' fees arising from Panera's willful misrepresentations and refusal to perform its contractual obligations.

     <u>**ANSWER:**</u>    **Defendants admit that Plaintiffs both purport to bring claims against Defendants on behalf of themselves and a "proposed Class" and that Plaintiffs seek to recover damages and obtain injunctive relief, costs of suit, and attorneys' fees. Defendants deny that Plaintiffs – or any putative class member – have a viable cause of action against them and further deny that a class action is appropriate. Defendants deny all remaining allegations in Paragraph 9.**

10.    The Court has personal jurisdiction over Panera because Panera maintains its principal place of business in Missouri. The Court also has personal jurisdiction pursuant to the Agreements at issue in this Complaint, which provide that "each party hereto agrees to submit to the exclusive personal jurisdiction and venue of the state and federal courts in the State of Missouri ... for resolution of all disputes and causes of action arising out of this agreement."

**ANSWER:** Paragraph 10 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants admit that the Court has personal jurisdiction over them. Defendants further state that the agreements attached to Plaintiffs' Complaint speak for themselves. Defendants deny all remaining allegations in Paragraph 10.

11. The Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). Diversity of citizenship exists between the named Plaintiffs and the Defendants, and less than one-third of the members of the proposed Class are citizens of Missouri. Based upon the nature and extent of the business involved, Plaintiffs believe that there are at least one hundred Class members and that the amount in controversy exceeds $5 million, exclusive of interest and costs.

**ANSWER:** Paragraph 11 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants admit that diversity exists between Defendants and Plaintiffs. Defendants deny that Plaintiffs – or any purported class member – have any viable claims against it and further deny that a class action is appropriate. Defendants are without sufficient knowledge or information to form a belief about Plaintiffs' allegations concerning the number of potential class members or amount in controversy and therefore deny the same. Defendants deny all remaining allegations in Paragraph 11.

12. The Court has subject matter jurisdiction over the named Plaintiffs' individual claims pursuant to 28 U.S.C. § 1332(a). Diversity of citizenship exists between each named Plaintiff and the Defendants, and the amount in controversy as to each named Plaintiff exceeds $75,000, exclusive of interest and costs.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**ANSWER:** **Paragraph 12 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants admit that diversity of citizenship exists between Defendants and Plaintiffs but deny the remaining allegations in Paragraph 12.**

13.     In addition, the Court has supplemental jurisdiction over the named Plaintiffs' individual claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the class claims in this action that they form part of the same case or controversy.

**ANSWER:** **Paragraph 13 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny that, to the extent Plaintiffs' class claims fail, the Court should exercise supplemental jurisdiction over their individual claims.**

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391. Panera has its principal place of business in this district, routinely transacts business in this district, and a substantial part of the events that gave rise to this action occurred here.

**ANSWER:** **Paragraph 14 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants admit only that their corporate headquarters lies within this District.**

15.     Venue is proper in the St. Louis Division under Civil L.R. 3 - 2.07 because Panera has its principal place of business in St. Louis, routinely transacts business in St. Louis, and a substantial part of the events that gave rise to this action occurred in St. Louis.

**ANSWER:** **Paragraph 15 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants admit only that their corporate headquarters lies within this Division.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

16. Missouri law applies to the claims of Plaintiffs and all Class members. Application of Missouri law is constitutional, and Missouri has strong interests in deterring unlawful business practices of resident corporations and compensating those harmed by activities occurring in and emanating from Missouri.

**ANSWER**: **Paragraph 16 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants state that the choice of law provisions in the agreement titled "Employment and Confidentiality Agreement" and agreement titled "Joint Venture General Manager Compensation Plan," attached to Plaintiffs' Complaint, speak for themselves. Defendants deny all remaining allegations in Paragraph 16.**

17. The parties have agreed that Missouri law applies to the claims of Plaintiffs and all Class members. The Employment Agreements at issue in this Complaint provide that "the validity, interpretation, and performance of this Agreement shall be governed by the laws of the State of Missouri without giving effect to the principles of comity or conflicts of laws thereof."

**ANSWER**: **Paragraph 17 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants state that the choice of law provisions in the agreement titled "Employment and Confidentiality Agreement" and agreement titled "Joint Venture General Manager Compensation Plan," attached to Plaintiffs' Complaint, speak for themselves. Defendants deny all remaining allegations in Paragraph 17.**

18. Plaintiffs' and Class members' relationship with Panera is centered in Missouri. Panera maintained (and continue to maintain) its principle place of business in St. Louis, and a substantial part of the events that gave rise to this action occurred in St. Louis.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**ANSWER:** **Paragraph 18 contains statement or conclusions of law to which no response is required. To the extent a response is required, Defendants admit that they maintain their principal place of business in St. Louis, Missouri. Defendants deny all remaining allegations in Paragraph 18.**

19.     For these reasons, among others, Missouri has significant contacts, and a significant aggregation of contacts, with all parties and the acts alleged herein. Missouri's substantial interests in this action far exceed those of any other state.

**ANSWER:** **Paragraph 19 contains statement or conclusions of law to which no response is required. To the extent a response is required, Defendants state that the choice of law provisions in the agreement titled "Employment and Confidentiality Agreement" and agreement titled "Joint Venture General Manager Compensation Plan," attached to Plaintiffs' Complaint, speak for themselves. Defendants deny all remaining allegations in Paragraph 19.**

20.     Plaintiff Mark Boswell is a resident of North Carolina. From approximately August 17, 2003 until July 1, 2014, Mr. Boswell was a resident of North Carolina and worked for Panera as a Joint Venture General Manager in Concord, North Carolina. Mr. Boswell was injured in his business or property by reason of Panera's wrongful acts alleged herein.

**ANSWER:** **Defendants are without knowledge or information concerning Plaintiff Boswell's residence and therefore deny the same. Defendants admit that Plaintiff Boswell began working for Defendant Panera, LLC on August 17, 2003 and was promoted to Joint Venture General Manager in October 2003. Defendants deny all remaining allegations in paragraph 20.**

21.     Plaintiff David Lutton is a resident of North Carolina. From approximately January 1, 2004 until July 1st, 2014, Mr. Lutton was a resident of North Carolina and worked for Panera as a Joint Venture General Manager in Matthews, North Carolina. Mr. Lutton was injured in his business or property by reason of Panera's wrongful acts alleged herein.

**ANSWER**:  **Defendants are without knowledge or information concerning Plaintiff Lutton's residence and therefore deny the same.  Defendants admit that Plaintiff Lutton was employed by Defendant Panera, LLC as a Joint Venture General Manager in Matthews, North Carolina from approximately January 2004 until July 2014.  Defendants deny all remaining allegations in Paragraph 21.**

22.     Defendant Panera Bread Company is a Delaware corporation registered to do business in Missouri. Its corporate headquarters are located at 363o S. Geyer Road, Suite 100, St. Louis, Missouri 63127.

**ANSWER**:  **Defendants admit that Panera Bread Company is a Delaware corporation and that it maintains its principal place of business at 3630 South Geyer Road, Suite 100, St. Louis, Missouri 63127.**

23.     Defendant Panera LLC is a Delaware limited liability company wholly owned by Panera Bread Company. Its principal place of business is also located at 3630 S. Geyer Road, Suite l00, St. Louis, Missouri 63127.

**ANSWER**:  **Defendants admit the allegations in Paragraph 23.**

24.     Panera Bread Company and Panera LLC were the joint employers of Plaintiffs and the members of the proposed Class.

**ANSWER**:  **Paragraph 24 contains a statement or conclusion of law to which no response is required.  To the extent a response is required, Defendants admit that Plaintiffs**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Case 4:14-cv-01033-RCF Doc #: 1-1 Filed: 12/12/14 Page: 10 of 42 PageID #: 33

were employed by Defendant Panera, LLC.  Defendants deny all remaining allegations in
Paragraph 24.

25.     Plaintiffs bring this action on behalf of themselves and all others similarly situated
(the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The
Class is defined as follows:

> All natural persons who were employed as "Joint Venture General
>
> Managers" with Panera, or any affiliate or subsidiary of Panera,
>
> and who received a capped )11 GM Buyout payment from Panera
>
> at any time during the period from January 1, 2011 through the
>
> date of trial (the "Class Period"). A "capped" Buyout payment is a
>
> Buyout payment made to an employee in an amount less than the
>
> total Buyout amount determined in accordance with the provisions
>
> of the employee's Joint Venture General Manager Compensation
>
> Plan.

**ANSWER:     Defendants admit that Plaintiffs purport to bring class action claims
against them.  Defendants deny that Plaintiffs – or any putative class members – have a
viable cause of action against them and further deny that a class action is appropriate.
Defendants further deny the existence of any "Class" and deny all remaining allegations in
Paragraph 25.**

26.     These persons constitute a class so numerous that joinder is impracticable.
Plaintiffs do not, as yet, know the exact size of the Class because such information is in the
exclusive control of Panera. Based upon the nature and extent of the business involved, Plaintiffs
believe that there are at least one hundred Class members, and that Class members are

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

geographically dispersed throughout the United States. Joinder of all members of the Class, therefore, is not practicable.

**ANSWER:** **Paragraph 26 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "Class" or "Class members." Defendants deny all remaining allegations in Paragraph 26.**

27.     Joinder is also impracticable as Panera currently employs many members of the proposed class. These persons are unlikely to pursue individual claims against Panera for fear of losing their jobs.

**ANSWER:** **Paragraph 27 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there are any "members of the proposed class." Defendants deny all remaining allegations in Paragraph 27.**

28.     Because Panera acted uniformly in connection with all plaintiffs, this action presents questions of law and fact common to all members of the class, and which predominate over any questions affecting only individual members of the class.

**ANSWER:** **Paragraph 28 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "class" or "members of the class." Defendants deny all remaining allegations in Paragraph 28.**

29.     The questions of law or fact common to the Class include but are not limited to:

a.     whether the conduct of Panera constitutes a material breach of its contracts with Plaintiffs and the Class;

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

b. whether Panera fraudulently induced Plaintiffs and the Class to accept employment with Panera;

c. whether Panera fraudulently induced Plaintiffs and the Class to continue their employment with Panera;

d. whether Panera's actions constitute conversion of personal property;

e. whether Plaintiffs and the Class suffered damages as a result of Panera's conduct;

f. the difference between the total compensation Plaintiffs and the Class received from Panera, and the total compensation Plaintiffs and the Class would have received in the absence of the wrongful and fraudulent a As alleged herein;

g. the type and measure of damages suffered by Plaintiffs and the Class.

**ANSWER:** **Paragraph 29 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "Class." Defendants deny all remaining allegations in Paragraph 29.**

30. These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

**ANSWER:** **Paragraph 30 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "Class" or "Class members." Defendants deny all remaining allegations in Paragraph 30.**

31. The impacts of the offenses committed by Panera are common to all plaintiffs. Plaintiffs' claims are typical of the claims of the Class. Each named Plaintiff has a substantial financial interest in this action, and the interests of the named Plaintiffs are neither coincident with nor adverse to the class they represent. Therefore, these named Plaintiffs will adequately protect the interests of the class.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**ANSWER:** **Paragraph 31 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "Class." Defendants deny all remaining allegations in Paragraph 31.**

32.    Plaintiffs have retained counsel competent in class action litigation to represent themselves and the Class.

**ANSWER:** **Paragraph 32 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "Class." Defendants deny all remaining allegations in Paragraph 32.**

33.    Panera has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**ANSWER:** **Paragraph 33 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "Class" or "Class members." Defendants deny all remaining allegations in Paragraph 33.**

34.    Panera utilizes standard compensation agreements and rigid compensation practices that apply uniformly to all or nearly all Class members. Therefore, class-wide evidence is capable of showing that Panera's conduct violated its contractual obligations generally, and that this violation affected all or virtually all Class members.

**ANSWER:** **Paragraph 34 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "Class" or "Class members." Defendants deny all remaining allegations in Paragraph 34.**

35.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a

class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Panera.

**ANSWER:** **Paragraph 35 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny there is any "Class" or "Class members." Defendants deny all remaining allegations in Paragraph 35.**

36.     Panera is a restaurant chain that operates bakery-cafes throughout the country. Panera began as the Au Bon Pain Company, Inc. in Massachusetts in 1981 and expanded by purchasing the Saint Louis Bread Company in 1993. In 1998, the Company formally changed its name to The Panera Bread Company after selling the Au Bon Pain division.

**ANSWER:** **Defendants deny that the Company formerly changed its name to the Panera Bread Company in 1998 and deny that Defendant Panera Bread Company operates bakery-cafes. Defendants admit the remaining allegations in Paragraph 36.**

37.     Between 2000 and 2005, Panera achieved rapid growth by continuously opening new company-owned and franchise-operated cafes in a ratio of 30/70, respectively, as set by the Company. As a result of this aggressive strategy, the total number of bakery-cafes more than quadrupled (from 183 stores to 877 stores) from 2000 to 2005.

**ANSWER: Defendants admit that, between 2000 and 2005, business grew rapidly. Defendants deny all remaining allegations in Paragraph 37.**

38.     The arrangements between Panera and its franchisees, governed by Area Development Agreements ("ADA"), were designed to ensure this dramatic growth. Panera's ADAs required franchisees to open a pre-determined number of stores under threat of

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

reacquisition - regardless of the economic environment or the success of existing stores in the area.

**ANSWER:  Defendants admit that the arrangements between Defendant Panera Bread Company and its franchisees are governed, in part, by Area Development Agreements.  Defendants deny that such Agreements have any bearing on any of Plaintiffs' allegations and further deny that Defendants have any control over the employment practices of their franchisees. Defendants deny all remaining allegations in Paragraph 38.**

39.    By the end of 2005, Panera's expansion strategy had caused it to become oversaturated in as many as 34 markets of the Nielson Top so markets. Increasingly, the Company suffered from cannibalization, resulting from too many stores opening in proximity to one another, which drove down average unit volume (i.e., weekly sales) and depleted margins.

**ANSWER:    Defendants deny the allegations contained in Paragraph 39.**

40.    Panera, however, continued to aggressively open new stores, as close as two miles to the franchisee stores, without regard for the resulting cannibalization. Panera's ADA's required franchisees to open a pre-determined number of stores each year, but as a result of cannibalization, franchisees had problems meeting requirements for not only the new store openings, but also sales targets at their existing stores.

**ANSWER:    Defendants deny that the "ADA" Agreements have any bearing on any of Plaintiffs' allegation and further deny that Defendants have any control over the employment practices of their franchisees. Defendants deny the allegations contained in Paragraph 40.**

41.    Cannibalization hindered the ability of franchisees to open new stores. It became increasingly difficult for franchisees to meet Panera's store expansion goals, as existing

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

franchisee operations yielded insufficient income to meet their own requirements, let alone to serve as start-up capital for new stores, the cost of which climbed from approximately $1.4 million in 2001 to $1.9 million in 2008. The cannibalization was intensified for franchise-owned stores because of a 5% franchise fee on gross sales that all franchisees were contractually obligated to pay to Panera.

**ANSWER:** **Defendants deny that they have any control over the employment practices of their franchisees and further deny that any such employment practice of a franchisee has any bearing on any allegation raised by Plaintiffs' Complaint. Defendants deny the allegations contained in Paragraph 41.**

42. Consequently, beginning in 2005, Panera experienced a dramatic reduction in the percentage of stores that were franchise owned, and a corresponding increase in its reliance on company-owned stores to drive growth. This change threatened to dramatically impact Panera's earnings. Indeed, Panera had a near 100% profit margin on franchisee stores, while company-owned stores generated profit margins of only 19%.

**ANSWER:** **Defendants deny the allegations contained in Paragraph 42.**

43. Between 2005 and 2014, the percentage of company-owned stores to total stores increased from 30% to 49%, and the number of company-owned stores nearly tripled, from 311 stores to 867 stores.

**ANSWER:** **Defendants admit that, between 2005 and 2014, Defendants experienced growth in the number of company owned-stores. Defendants deny all remaining allegations in Paragraph 43.**

44. During the Class Period, Panera employed Plaintiffs and the Class as Joint Venture General Managers ("JV GMs") to manage the daily operations of its company-owned cafes.

**ANSWER: Defendants admit that Plaintiffs Boswell and Lutton were employed by Defendant Panera, LLC as Joint Venture General Managers from August 2003 until May 2014 and January 2004 until July 2014, respectively. Defendants further admit that Joint Venture General Managers are tasked with supervising the daily operations of their assigned bakery-café. Defendants are without sufficient information to form a belief as to the employment of unnamed "Class Members" and therefore deny the same. Defendants deny the existence of any "Class" and deny all remaining allegations in Paragraph 44.**

45. Between 2005 and 2010, each Plaintiff and member of the Class entered into a written five-year "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Panera. The Agreement and Plan were integrated, unambiguous contracts.

**ANSWER: Defendants admit that Plaintiffs both entered into the agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC that are attached to the Complaint. Those agreements speak for themselves. Whether the contracts are "unambiguous" is a legal conclusion to which no response is required. Defendants are without sufficient information to form a belief as to any agreement that may have been entered into by unnamed "Class Members" and therefore deny the same. Defendants deny the existence of any "Class" and deny all remaining allegations in Paragraph 45.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

46. The relevant terms of the individual Agreements and Plans signed by each Plaintiff and member of the Class were, in all material respects, identical or substantially identical. Copies of the Agreements and Plans signed by the named Plaintiffs are attached hereto as Exhibits 1 and 2.

**ANSWER:** **Defendants admit that Plaintiffs both entered into the Agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC that are attached to the Complaint. Those agreements speak for themselves. Defendants are without sufficient information to form a belief as to any agreement that may have been entered into by unnamed "Class Members" and therefore deny the same. Defendants deny the existence of any "Class" and deny all remaining allegations in Paragraph 46.**

47. Pursuant to these contracts, each Plaintiff and Class member agreed to be employed by Panera as the "Joint Venture General Manager" of a company-owned café, with managerial responsibility for all of the café's daily operations, and supervisory responsibility over all other employees at the cafe.

**ANSWER:** **Defendants admit that Plaintiffs both entered into the Agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC that are attached to the Complaint. Those agreements speak for themselves. Defendants are without sufficient information to form a belief as to any agreement that may have been entered into by unnamed "Class Members" and therefore deny the same. Defendants deny the existence of any "Class" and deny all remaining allegations in Paragraph 47.**

48.     Together, the Agreement and Plan comprised the "final, complete, and exclusive agreement between [the JV GM] and Panera with respect to any bonus, incentive plan, or other compensation."

**ANSWER:     Defendants admit that Plaintiffs both entered into the Agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC that are attached to the Complaint. Those agreements speak for themselves.  Defendants deny all remaining allegations in Paragraph 48.**

49.     These contracts provided that the JV GM would receive a small annual salary for five years, and, at the end of the fifth year, a "one-time JV GM Buyout" payment.

**ANSWER:     Defendants admit that Plaintiffs both entered into the Agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC that are attached to the Complaint. Those agreements speak for themselves.  Defendants deny all remaining allegations in Paragraph 49.**

50.     These contracts required that the amount of the Buyout payment was to be determined in accordance with specific provisions set forth in the Plan, which turned on the profitability of the JV GM's cafe. Pursuant to those provisions, the greater the difference between the aggregate profits attributed to a JV GM's café and the applicable pre-determined profit hurdle, the greater the Buyout amount.

**ANSWER:     Defendants admit that Plaintiffs both entered into the Agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC that are attached to the Complaint.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Those agreements speak for themselves. Defendants deny all remaining allegations in Paragraph 50.

51.     Neither the Plan nor the Agreement placed any limitation on the amount of the Buyout payment, or authorized Panera to reduce the amount of the Buyout payment below the full amount determined in accordance with the Plan.

**ANSWER:**   **Defendants admit that Plaintiffs both entered into the Agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC that are attached to the Complaint. Those agreements speak for themselves. Defendants deny all remaining allegations in Paragraph 51.**

52.     Indeed, the contracts forbade such behavior. In plain and unambiguous terms, the Plan provided that "[n]o modification or waiver shall be valid unless in writing signed by the party against whom the same is sought to be enforced." The Plan thus barred Panera from reducing the amount of any JV GM's Buyout payment without a written modification or waiver of the Plan's Buyout provisions, signed by the JV GM.

**ANSWER:**   **Defendants admit that Plaintiffs both entered into the Agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC that are attached to the Complaint. Those agreements speak for themselves. Defendants deny all remaining allegations in Paragraph 52.**

53.     The Buyout provisions and "no modification" provisions were material terms of these contracts, because they governed the amount of compensation Plaintiffs and the Class were entitled to receive as employees of Panera.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**ANSWER:** **Paragraph 53 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 53.**

54.     By entering into the Agreement and Plan with Plaintiffs and the Class, Panera represented to each Plaintiff and member of the Class that it would honor these contracts. Panera represented to Plaintiffs and the Class that it would pay them in accordance with the provisions of the Plan, and that it would not reduce their Buyout payments below what the Plan required without a written modification or waiver of the Plan, signed by the JV GM whose Buyout payment would be reduced by the modification or waiver.

**ANSWER:** **Defendants admit that Defendant Panera, LLC entered into the agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Plaintiffs in good faith. Defendants further state that those agreements speak for themselves. Defendants are without sufficient information to form a belief as to any agreement that may have been entered into by unnamed "Class Members" and therefore deny the same. Defendants deny the existence of any "Class" and deny all remaining allegations in Paragraph 54.**

55.     By not obtaining such written agreements from Plaintiffs and the Class, Panera continuously represented to Plaintiffs and the Class that it would make Buyout payments to them in accordance with the provisions of Plan.

**ANSWER:** **Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 55.**

56.     When Panera made these representations, it knew that they were false. In particular, when Panera represented to Plaintiffs and the Class that it would not reduce their

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Buyout payments without obtaining a signed modification to the Plan, Panera knew this representation to be false.

**ANSWER:** **Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 56.**

57.     When Panera made these representations, it did so with the intention that Plaintiffs and the Class would rely upon them.

**ANSWER:** **Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 57.**

58.     When Plaintiffs and the Class agreed to manage Panera's cafes, and to continue their employment with Panera for five years, they relied on Panera's representations that it would honor their contracts. They relied on Panera's representations that it would pay them in accordance with the provisions of the Plan, that it would make Buyout payments to them in the amount required by the Plan. They relied on Panera's representations that it would not reduce their Buyout payments below what the Plan required without their signed consent to a written modification or waiver of the Plan. Plaintiffs and the Class continuously relied on these representations throughout their employment as JV GMs.

**ANSWER:** **Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 58.**

59.     The Buyout payments were wages earned by Plaintiffs and members of the Class and a material component of their compensation.

**ANSWER:** **Paragraph 59 contains statements or conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 59.**

60. During the Class Period, each Plaintiff and member of the Class was entitled to receive a Buyout payment pursuant to the Plan.

**ANSWER:** **Defendants admit that Plaintiffs both entered into the "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC attached to the Complaint. Those agreements speak for themselves. Defendants further admit that Plaintiffs received "JV GM Buyout" payments in May 2014. Defendants are without sufficient information to form a belief as to any agreement that may have been entered into by unnamed "Class Members" and therefore deny the same. Defendants deny the existence of any "Class" and deny all remaining allegations in Paragraph 60.**

61. Panera did not obtain written modifications or waivers of the Plan's Buyout provisions signed by Plaintiffs or other members of the Class. Panera thus had a contractual duty to make a Buyout payment to each Plaintiff and Class member in the full amount determined in accordance with the provisions of the Plan.

**ANSWER:** **Paragraph 61 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants admit that JV-GMs were provided with written notification of the modification. Defendants deny the existence of any "Class" and deny all remaining allegations in Paragraph 61.**

62. Panera did not do this. Instead, beginning in 2011, Panera unilaterally imposed a "cap" on the Buyout payments it made to JV GMs. Panera's use of a cap reduced the amount of the Buyout payments it made to Plaintiffs and the Class below the amounts determined in accordance with the Plan.

**ANSWER:** **Defendants deny the allegations in Paragraph 62.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

63. The purpose and effect of this practice, instituted and approved by Panera's executives, is that Panera willfully deprived Plaintiffs and the Class of wages they had bargained for and earned.

**ANSWER:** **Defendants deny the allegations in Paragraph 63.**

64. Panera is liable for its actions, which constitute fraud in the inducement to enter into the Agreement and Plan, conversion, and material breaches of contract.

**ANSWER:** **Defendants deny the allegations in Paragraph 64.**

65. Pursuant to the Plan, the Buyout amount is a function of the difference between the total profits attributed to a JV GM's store and the applicable pre-determined "profit hurdle" for that store. Thus, the suppression of total profits attributed to a store will result in a suppression of the Buyout payment to that store's JV GM.

**ANSWER:** **Defendants admit that Plaintiffs both entered into the "Joint Venture General Manager Compensation Plan" with Defendant Panera, LLC, attached to the Complaint. Those agreements speak for themselves. Defendants deny all remaining allegations in Paragraph 65.**

66. While most of the factors affecting a store's profits, such as quality control and customer service, are within the control of the JV GM's independent judgment and decision-making, sometimes Panera makes decisions that serve its own interests, but predictably decrease a store's profits, which the JV GM cannot control.

**ANSWER:** **Defendants admit that Joint Venture General Managers are given the discretion to make certain decisions that may affect the profitability of their assigned bakery-café. Defendants further admit that Defendant Panera, LLC, as the owner-**

24

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

operator of these bakery-cafes, also make decisions that may affect the profitability of these bakery-cafes. **Defendants deny all remaining allegations in Paragraph 66.**

67. In 2013, Panera selected stores in the Charlotte, North Carolina area, including Plaintiffs' stores, to implement "Panera 2.0" - a new "operating system" that entailed substantial increases in a store's operating costs.

**ANSWER:** **Defendants admit that "Panera 2.0," a series of integrated technologies meant to enhance customer experience, was launched in the Charlotte, North Carolina area beginning in 2013. Defendants deny all remaining allegations in Paragraph 67.**

68. Because increased costs at a JV GM's store decrease that store's profits, and thus, the amount of the JV GM's Buyout payment, the impact of Panera 2.0 on their store profits was a critical concern for Plaintiffs in deciding whether to implement Panera 2.0 in their stores, and in deciding whether to continue their employment with Panera.

**ANSWER:** **Defendants are without sufficient information to admit or deny the allegation concerning Plaintiffs' motivation in continuing their employment with Panera and, therefore, deny the same. Defendants deny all remaining allegations in Paragraph 68.**

69. To induce Plaintiffs to implement Panera 2.0 and continue their employment, despite the negative impact on their stores' profits, Panera promised Plaintiffs and other Charlotte area JV GMs a profit "credit" to offset the increased operating costs attributable to Panera 2.0.

**ANSWER:** **Defendants deny the allegations in Paragraph 69.**

70. When Plaintiffs agreed to implement Panera 2.0 in their stores, and continue his employment, despite the negative impact on their store profits, Plaintiffs relied on the

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

representations of Panera that it would provide a profit credit to offset the increased operating costs attributable to Panera 2.0.

**ANSWER:** **Defendants deny the allegations in Paragraph 70.**

71. Although Panera intended Mr. Boswell and Mr. Lutton to rely on its representations, Panera had no intention of providing the credit. When Panera calculated Plaintiffs' Buyout payments in March 2014, Panera did not credit their respective profits to offset the increased operating costs of Panera 2.0. Because the omission of this credit suppressed the total profits attributable to Plaintiffs' cafes, the amounts of Mr. Boswell's and Mr. Lutton's respective (uncapped, Buyout payments were suppressed.

**ANSWER:** **Defendants admit that Plaintiffs were not "credited" with any offset for any increased operating costs due to the implementation of Panera 2.0. Defendants deny any remaining allegations in Paragraph 71.**

72. As a direct and proximate result of Panera's misrepresentations, Plaintiffs Boswell and Lutton suffered irreparable injury and monetary damages.

**ANSWER:** **Defendants deny the allegations in Paragraph 72.**

## COUNT ONE

## BREACH OF CONTRACT

73. Plaintiffs re-allege and incorporate herein by reference each and every paragraph and allegation above as though fully set forth herein.

**ANSWER:** **Defendants incorporate their responses to Paragraphs 1-72 as if fully set forth here.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

74. Each Plaintiff and member of the Class had a valid and enforceable contract with Panera through the Agreement and Plan described above.

**ANSWER:** **Paragraph 74 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 74.**

75. Pursuant to the Plan, each Plaintiff and member of the Class had a contractual right to receive a Buyout payment from Panera in the amount determined in accordance with the specific provisions set forth in the Plan.

**ANSWER:** **Paragraph 75 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 75.**

76. Pursuant to the Plan, Panera had a contractual duty to make a Buyout payment to each Plaintiff and member of the Class in the amount determined in accordance with the specific provisions set forth in the Plan.

**ANSWER:** **Paragraph 76 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 76.**

77. The Buyout payments were wages earned by Plaintiffs and the Class and a material component of their compensation.

**ANSWER:** **Paragraph 77 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 77.**

Case: 4:14-cv-01663-AGF Doc. #: 1-1 Filed: 12/12/14 Page: 28 of 126 PageID #: 101

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

78. Panera materially breached its contracts with Plaintiffs and the Class by unilaterally reducing the amounts of the Buyout payments to Plaintiffs and the Class below the amounts determined in accordance with the Plan.

**ANSWER:** **Defendants deny the allegations in Paragraph 78.**

79. As a direct and proximate result of Panera's conduct in violation of these contracts, Plaintiffs and the Class suffered monetary damages.

**ANSWER:** **Defendants deny the allegations in Paragraph 79.**

80. Accordingly, Plaintiffs and the Class pray for judgment in their favor and against Panera:

A. Declaring that Panera materially breached its contracts with Plaintiffs and the Class;

B. Awarding Plaintiffs and the Class damages in an amount to be proven at trial; and

C. Awarding Plaintiffs and the Class prejudgment interest, plus costs of suit and reasonable attorney fees.

**ANSWER:** **Defendants deny that Plaintiffs, or any purported class member, are entitled to any of the relief requested in Paragraph 80, including subparagraphs A-C.**

## COUNT TWO

## FRAUD

81. Plaintiff re-alleges and incorporates herein by reference each and every paragraph and allegation above as though fully set forth herein.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**ANSWER:** **Defendants incorporate their responses to Paragraphs 1-80 as if fully set forth here.**

82.     By entering into the Agreement and Plan with Plaintiffs and the Class, Panera represented to each Plaintiff and member of the Class that it would honor the plain terms of these contracts. Panera represented to Plaintiffs and the Class that it would pay them in accordance with the provisions of the Plan, including the Buyout provisions, and that it would not reduce their compensation below what the Plan required without a written modification or waiver of the Plan, signed by the JV GM whose compensation would be reduced by the modification or waiver.

**ANSWER:** **Defendants admit that Defendant Panera, LLC entered into the agreements titled "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with both Plaintiffs in good faith. Defendants further state that those agreements speak for themselves. Defendants are without sufficient information to form a belief as to any agreement that may have been entered into by unnamed "Class Members" and therefore deny the same. Defendants deny the existence of any "Class" and deny all remaining allegations in Paragraph 82.**

83.     By not obtaining such written agreements from Plaintiffs and the Class, Panera continuously represented that it would compensate them in accordance with the provisions of Plan.

**ANSWER:** **Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 83.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

84. Panera's representations described above were material, because the Plan governed the compensation that Plaintiffs and Class members were entitled to receive as employees of Panera.

**ANSWER: Paragraph 84 contains statements or conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 84.**

85. Panera's representations were false. Panera did not pay Plaintiffs and Class the Buyout payments as required by the Plan. Instead, and without obtaining written modifications signed by Plaintiffs and the Class, Panera reduced the amounts of the Buyout payments to Plaintiffs and the Class below the amounts required by the Plan.

**ANSWER: Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 85.**

86. When Panera made these representations, it knew that they were false. In particular, when Panera represented to Plaintiffs and Class that it would not reduce their compensation without obtaining a signed modification to the Plan, Panera knew this representation to be false.

**ANSWER: Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 86.**

87. When Panera made these representations, it did so with the intention that Plaintiffs and the Class would rely upon them.

**ANSWER: Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 87.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

88.     When Plaintiffs and the Class agreed to accept employment with Panera, they relied on Panera's representations that it would pay them in accordance with the provisions of the Plan, and that it would not reduce their compensation below what the Plan required without obtaining a signed modification to the Plan.

**<u>ANSWER</u>:     Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 88.**

89.     When Plaintiffs and the Class agreed to continue their employment with Panera, they relied on Panera's representations that it would pay them in accordance with the provisions of the Plan, and that it would not reduce their compensation below what the Plan required without obtaining a signed modification to the Plan.

**<u>ANSWER</u>:     Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 89.**

90.     As employees of Panera, Plaintiffs and the Class had a right to rely on Panera's representations.

**<u>ANSWER</u>:     Defendants deny the existence of any "Class" and deny  the remaining allegations in Paragraph 90.**

91.     Plaintiffs and the Class did not know, and could not have known, that Panera's representations were false.

**<u>ANSWER</u>:     Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 91.**

92.     As a direct and proximate result of their reliance on Panera's material misrepresentations, Plaintiffs and the Class suffered irreparable injury and monetary damages.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**ANSWER:** **Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 92.**

93.     Panera's actions described herein were willful, malicious, and without legal justification.

**ANSWER:** **Defendants deny the allegations in Paragraph 93.**

94.     Accordingly, Plaintiffs and the Class pray for judgment in their favor and against Panera:

A.     Declaring that Panera's actions constitute fraud;

B.     Declaring that Panera's actions were willful, malicious, and without legal justification;

C.     Awarding Plaintiffs and the Class compensatory damages in an amount to be proven at trial;

D.     Awarding Plaintiffs and the Class prejudgment interest, plus costs of suit and reasonable attorney fees;

E.     Awarding punitive damages against Panera in an amount sufficient to deter similar conduct by Panera and others in the future; and

F.     Permanently enjoining Panera from ever again engaging in similar conduct against its employees in the future.

**ANSWER:** **Defendants deny that Plaintiffs, or any purported class member, are entitled to any of the relief requested in Paragraph 94, including subparagraphs A-F.**

**COUNT THREE**

**CONVERSION**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

95.     Plaintiffs re-allege and incorporate herein by reference each and every paragraph and allegation above as though fully set forth herein.

**ANSWER:     Defendants incorporate their responses to Paragraphs 1-94 as if fully set forth here.**

96.     Each Plaintiff and member of the Class was entitled to receive a Buyout payment in the full amount determined in accordance with the Plan.

**ANSWER:     Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 96.**

97.     Each Plaintiff and member of the Class was entitled to own and possess a Buyout payment in the full amount determined in accordance with the Plan.

**ANSWER:     Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 97.**

98.     Each Plaintiff and member of the Class has the right to immediate possession of a Buyout payment in the full amount required by the Plan.

**ANSWER:     Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 98.**

99.     When Panera refused to make Buyout payments to Plaintiffs and the Class in the full amounts required by the Plan, Panera intentionally took from each Plaintiff and member of the Class tangible, identifiable funds that rightfully belonged to Plaintiffs and the Class. These tangible, identifiable funds are the personal property of Plaintiffs and the Class.

**ANSWER:     Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 99.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

100.    When Panera refused to make Buyout payments to Plaintiffs and the Class in the full amounts required by the Plan, Panera intentionally deprived each Plaintiff and member of the Class of the possession of their personal property.

**ANSWER:    Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 100.**

101.    Panera had no authority or lawful justification to take the personal property of Plaintiffs and the Class. Panera had no authority or lawful justification to deprive Plaintiffs and the Class of the possession of their personal property.

**ANSWER:    Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 101.**

102.    Panera's actions described herein were willful, malicious, and without legal justification.

**ANSWER:    Defendants deny the allegations in Paragraph 102.**

103.    As a direct and proximate result of Panera's conversion of their personal property, Plaintiffs and the Class suffered irreparable injury and monetary damages.

**ANSWER:    Defendants deny the existence of any "Class" and deny the remaining allegations in Paragraph 103.**

104.    Accordingly, Plaintiffs and the Class pray for judgment in their favor and against Panera:

A.    Declaring that Panera's actions constitute conversion of the personal property of Plaintiffs and the Class;

B.    Declaring that Panera's actions were willful, malicious, and without legal justification;

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

     C.     Awarding Plaintiffs and the Class compensatory damages in an amount to be proven at trial;

     D.     Awarding Plaintiffs and the Class prejudgment interest, plus costs of suit and reasonable attorney fees;

     E.     Awarding punitive damages against Panera in an amount sufficient to deter similar conduct by Panera and others in the future; and

     F.     Permanently enjoining Panera from ever again engaging in similar conduct against its employees in the future.

**ANSWER: Defendants deny that Plaintiffs, or any purported class member, are entitled to any of the relief requested in Paragraph 104, including subparagraphs A-F.**

## COUNT FOUR

## FRAUD

105.    Plaintiffs re-allege and incorporate herein by reference each and every paragraph and allegation above as though fully set forth herein.

**ANSWER:    Defendants incorporate their responses to Paragraphs 1-104 as if fully set forth here.**

106.    To induce Plaintiff Boswell and Plaintiff Lutton to implement Panera 2.0 in the stores and continue their employment, despite the negative impact of Panera 2.0 on their stores' profits, Panera promised Plaintiffs and other Charlotte area JV GMs a profit credit to offset the increased operating costs attributable to Panera 2.0.

**ANSWER:    Defendants deny the allegations in Paragraph 106.**

107.    When Plaintiffs agreed to implement Panera 2.0 in their stores, and continue their employment, Plaintiffs relied on the representations of Panera that it would provide a profit

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

credit to offset the increased operating costs attributable to Panera 2.0. Panera's representations were therefore material to each Plaintiff's decision to continue his employment with Panera.

> **<u>ANSWER</u>:** **Defendants deny the allegations in Paragraph 107.**

108. As employees of Panera, Plaintiff's had a right to rely on Panera's representations.

> **<u>ANSWER</u>:** **Defendants deny the allegations in Paragraph 108.**

109. Although Panera intended Plaintiffs to rely on its representations, Panera had no intention of providing the credit. It made these representations knowing that they were false. When Panera calculated Plaintiffs' Buyout payments in March 2014, Panera did not credit their respective profits to offset the increased operating costs of Panera 2.0.

> **<u>ANSWER</u>:** **Defendants deny the allegations in Paragraph 109.**

110. Because the omission of this credit suppressed the total profits attributable to Plaintiffs' cafes, the amounts of Mr. Boswell's and Mr. Lutton's respective (uncapped) Buyout payments were suppressed.

> **<u>ANSWER</u>:** **Defendants deny the allegations in Paragraph 110.**

111. Plaintiffs did not know, and could not have known, that Panera's representations were false.

> **<u>ANSWER</u>:** **Defendants deny the allegations in Paragraph 111.**

112. As a direct and proximate result of their reliance on Panera's material misrepresentations, Plaintiffs suffered irreparable injury and monetary damages.

> **<u>ANSWER</u>:** **Defendants deny the allegations in Paragraph 112.**

113. Panera's actions described herein were willful, malicious, and without legal justification.

> **<u>ANSWER</u>:** **Defendants deny the allegations in Paragraph 113.**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

114.    Accordingly, Plaintiffs Mark Boswell and David Lutton prays for judgment in their favor and against Panera:

    A.    Declaring that Panera's actions constitute fraud;

    B.    Declaring that Panera's actions were willful, malicious, and without legal justification;

    C.    Awarding Plaintiffs compensatory damages in an amount to be proven at trial;

    D.    Awarding Plaintiffs prejudgment interest, plus costs of suit and reasonable attorney fees;

    E.    to deter similar conduct by Panera and others in the future; and

    F.    Permanently enjoining Panera from ever again engaging in similar conduct against its employees in the future.

**ANSWER:**    **Defendants deny that Plaintiffs, or any purported class member, are entitled to any of the relief requested in Paragraph 114, including subparagraphs A-F.**

**COUNT FIVE**

**UNJUST ENRICHMENT**

115.    Plaintiffs re-allege and incorporate herein by reference each and every paragraph and allegation above as though fully set forth herein.

**ANSWER:**    **Defendants incorporate their responses to Paragraphs 1-114 as if fully set forth here.**

116.    When Plaintiff Boswell and Plaintiff Lutton implemented Panera 2.0 in the stores and continued their employment with Panera, despite the negative impact of Panera 2.0 on their stores' profits, Plaintiffs conferred a benefit on Panera.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

**ANSWER:** Defendants deny the allegations in Paragraph 116.

117.    Panera acknowledged or recognized that Plaintiffs conferred a benefit on Panera by implementing Panera 2.0 in their stores and continuing their employment with Panera.

**ANSWER:** Defendants deny the allegations in Paragraph 117.

118.    Panera accepted and retained that benefit under circumstances in which retention without payment would be unjust. Panera induced Plaintiffs to implement Panera 2.0 in the stores and continue their employment with Panera by promising them a profit credit offset the increased operating costs of Panera 2.0 then failed to provide that credit.

**ANSWER:** Defendants deny the allegations in Paragraph 118.

119.    As a direct and proximate result of Panera's actions, Plaintiffs suffered irreparable injury and monetary damages, while Panera benefitted from their continued employment and implementation of Panera 2.0 in their stores.

**ANSWER:** Defendants deny the allegations in Paragraph 119.

120.    As a direct and proximate result of Panera's actions, Panera enriched itself at the expense of Plaintiff Boswell and Plaintiff Lutton. Allowing Panera to retain that benefit without payment to Mr. Boswell and Mr. Lutton would be unjust.

**ANSWER:** Defendants deny the allegations in Paragraph 120.

121.    Panera's actions described herein were willful, malicious, and without legal justification.

**ANSWER:** Defendants deny the allegations in Paragraph 121.

122.    Accordingly, Plaintiffs Mark Boswell and David Lutton pray for judgment in their favor and against Panera:

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

A. Declaring that Plaintiffs conferred a benefit on Panera, and that. Panera accepted and retained that benefit under circumstances in which retention without payment to Plaintiffs would be unjust;

B. Declaring that Panera's actions were willful, malicious, and without legal justification;

C. Awarding Plaintiffs restitution in an amount to be proven at trial;

D. Awarding Plaintiffs prejudgment interest, plus costs of suit and reasonable attorney fees;

E. Awarding punitive damages against Panera in an amount sufficient to deter similar conduct by Panera and others in the future; and

F. Permanently enjoining Panera from ever again engaging in similar conduct against its employees in the future.

**ANSWER:** **Defendants deny that Plaintiffs, or any purported class member, are entitled to any of the relief requested in Paragraph 122, including subparagraphs A-F. Defendants further deny Plaintiffs, or any purported class member, are entitled to any of the relief requested in the unnumbered paragraph beginning with "WHEREFORE" immediately following Paragraph 122. Defendants further deny Plaintiffs, or any purported class members, are entitled to a jury trial on any claims.**

## GENERAL DENIAL

**Defendants deny all allegations in Plaintiff's Complaint not expressly admitted herein.**

## AFFIRMATIVE AND OTHER DEFENSES

Defendants assert the following affirmative and other defenses without assuming any burden of production or proof that they would not otherwise have. For purposes of these

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Affirmative and Other Defenses, the term "Plaintiffs" includes Plaintiffs Boswell and Lutton and any putative class member.

1.     Plaintiffs' Complaint fails, in whole or in part, to state a claim upon which relief may be granted.

2.     Plaintiffs' claims, if any, are barred, in whole or in part, by applicable statutes of limitations and/or statutes of repose.

3.     Plaintiffs are estopped from pursuing the claims set forth in the Complaint by reason of their own acts, omissions, and course of conduct.

4.     Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrine of laches.

5.     Plaintiffs are barred from seeking any equitable relief because they each have an adequate remedy at law.

6.     Plaintiffs' claims are barred by the doctrine of payment.  Plaintiffs have each been paid any monies or benefits allegedly owed.

7.     Plaintiffs' damages, if any, must be reduced by any payments received under the "Joint Venture General Manager Compensation Plan."

8.     Plaintiffs' damages or injuries, if any, were not proximately caused by Defendants.

9.     Plaintiffs' breach of contract claim is barred by mutual mistake.

10.     Plaintiffs' claims are barred by the doctrines of accord and satisfaction.

11.     Defendants did not make any false representations.

12.     To the extent that any representations by Defendants were false, which is denied, Defendants lacked knowledge of the falsity of the representations.

13.     Plaintiffs cannot show they reasonably relied upon any alleged

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

misrepresentations, which are denied.

14.     Plaintiffs cannot show that they suffered any damages as a result of their reliance on the  alleged misrepresentations, which are denied.

15.     The Seventh and Fourteenth Amendments to the United States Constitution prohibit a jury from determining Defendants' liability and/or damages, if any, to Plaintiffs and others with whom they are allegedly "similarly situated" on a group or aggregated basis.

16.     Defendants presently have insufficient knowledge or information on which to form a belief as to whether they may have additional, as yet unstated, affirmative or other defenses available. Defendants reserve the right to assert additional defenses in the event that discovery indicates they would be appropriate.

Having fully answered Plaintiffs' Complaint, Defendants request the Complaint be dismissed with prejudice and Defendants be awarded their costs, attorneys' fees and such other relief as may be just and proper.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Respectfully submitted,

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

/s/ *Patrick F. Hulla* _____
Patrick F. Hulla, MO 41745
Justin M. Dean, MO 48647*
Jennifer K. Oldvader, MO 60649*
4520 Main Street, Suite 400
Kansas City, MO 64111
Telephone: 816.471.1301
Facsimile: 816.471.1303
patrick.hulla@ogletreedeakins.com
justin.dean@ogletreedeakins.com
jennifer.oldvader@ogletreedeakins.com

*Seeking admission to the U.S. District Court for the Eastern District of Missouri

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 12, 2014.

/s/ *Patrick F. Hulla*
**ATTORNEY FOR DEFENDANTS**

19762934.1

2022-CC01133

*Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| PANERA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| JAMES DOBSON, KRISH | ) | |
| GOPALAKRISHNAN, JAMES ("Kyle") | ) | |
| PHILLIPS, and ACT III MANAGEMENT, | ) | JURY TRIAL DEMANDED |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### COMPLAINT OF PANERA, LLC
### (INJUNCTIVE RELIEF REQUESTED)

Panera, LLC brings this action against three former employees, James Dobson, Krish Gopalakrishnan, and Kyle Phillips, as well as competing venture Act III Management, LLC (collectively, "Defendants"). This action seeks to redress Defendants' respective wrongful acts including, without limitation, breach of contract and unlawful use of Panera's confidential and proprietary information and trade secrets.[1]

Panera earned and maintained its position atop the "fast-casual" market for decades through technological innovation. Panera's technology became the company's competitive advantage in the industry and the company's most important asset. In targeting key Panera IT employees, the goal of Act III's scheme is obvious: to recreate and carve out Panera's main competitive advantage, but without any of the work. Act III's actions are nothing more than an attempt to get a head start in developing the valuable information and infrastructure Panera built. Act III's actions threaten to irreversibly damage Panera and the well-being of its

---

[1] This Complaint also serves as notice of Panera's intention to immediately arbitrate certain claims against Dobson, Gopalakrishnan, and Phillips pursuant to the terms of their respective Panera Non-Compete Agreements.

**Exhibit B**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

employees.  In addition to injunctive relief, Panera also seeks damages, attorney's fees and costs, and any other such relief as this Court deems just and proper.

## PARTIES

1.       Plaintiff Panera, LLC ("Panera") is a Delaware limited liability company having its principal place of business at 3630 South Geyer Road, Suite 100, St. Louis, Missouri.  Panera is a wholly owned subsidiary of Panera Bread Company.

2.       Defendant James Dobson ("Dobson") is an individual who, upon information and belief, currently resides in Kirkwood, Missouri.

3.       Defendant Krish Gopalakrishnan ("Gopalakrishnan") is an individual who, upon information and belief, currently resides in Lake Saint Louis, Missouri.

4.       Defendant James Phillips a/k/a Kyle Phillips ("Phillips") is an individual who, upon information and belief, currently resides in Olivette, Missouri.

5.       Act III Management, LLC ("Act III") is a Delaware limited liability company having its principal place of business at 23 Prescott Street, Brookline, Massachusetts.

## JURISDICTION AND VENUE

6.       This Court has subject matter jurisdiction under 18 U.S.C. § 1836(b), because Panera brings a claim of Defendants' violation of federal law pursuant to the Defend Trade Secrets Act ("DTSA").  The Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367.

7.       This Court has personal jurisdiction over Dobson, Gopalakrishnan, and Phillips because they are citizens of Missouri.

8.       This Court has personal jurisdiction over Act III pursuant to Mo. Rev. Stat. § 506.500.1(1)-(3) because it transacts business within Missouri, and has sufficient minimum contacts with Missouri to satisfy any due process concerns.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

9.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Panera's claims occurred in this District. Venue is also appropriate in this District by virtue of § 16.1 of the Confidential and Proprietary Information and Non-Competition Agreements ("Non-Compete Agreements") entered into by Dobson, Gopalakrishnan, and Phillips.

<u>BACKGROUND FACTS</u>

<u>Panera's History, Development, and Business</u>

10.     Panera began in 1980 as a single, 400-square-foot cookie store in Boston, Massachusetts. The store, called The Cookie Jar, expanded its cookie business by partnering in a small French bakery chain called Au Bon Pain. In 1991, Au Bon Pain Co. Inc. became publicly traded and, in the following years, opened hundreds of bakery-cafes in cities along the East Coast and overseas. In 1993, Au Bon Pain acquired the St. Louis Bread Company. In the mid-1990s, the team at Au Bon Pain reconceived the St. Louis Bread Company concept and named it Panera. Panera has since become a leader in the burgeoning fast-casual restaurant segment. In 1999, all Au Bon Pain divisions were sold to an investment firm. The remaining public company was renamed Panera Bread Company.

11.     Today, Panera is one of the largest food service brands in the United States, with more than 2,300 bakery-cafes, 140,000 associates, and annual system-wide sales in the billions.

12.     Panera's bakery-cafes are located in urban, suburban, and regional mall locations. Panera sells made-to-order sandwiches, tossed-to-order salads, soups, freshly baked breads, and other food and bakery items for dining-in, carry-out and for delivery. Panera features high-quality food in a warm, inviting, and comfortable environment.

13.     Nearly all of Panera's bakery-cafes routinely donate bread and baked goods to community organizations in need through Panera's "Day End Dough-Nation" program which, in 2018, donated over one hundred million dollars in retail value of goods.

<u>Panera and Act III's Place in the Market</u>

14.     Panera occupies what is called the "fast-casual" space in the restaurant marketplace.  Fast-casual can be distinguished from other types of restaurants, such as quick service restaurants ("QSR"), like McDonald's, and full service restaurants, like Chili's or Applebee's.  Fast-casual restaurants occupy the space in between: they are higher-end than QSRs, but are not full service.

15.     Generally speaking, "fast-casual" seeks to offer a premium dining experience for reasonable prices.  The fast-casual marketplace can further be broadly divided into two segments: burger brands and non-burger brands, the latter of which typically focuses on fresh and healthy produce, sandwiches, and baked goods.

16.     Act III and the brands it owns and manages—like Cava Mezze Grill ("Cava"), Zoe's Kitchen, and Tatte Bakery & Café ("Tatte")—occupy the same non-burger, fast-casual market space as Panera.  They offer salads, sandwiches, grain bowls, and baked goods in a high-end restaurant experience.  For example, Zoe's Kitchen offers soups, salads, and sandwiches in a similar environment as Panera.  And Tatte, like Panera, appeals to high-end consumers with artisanal pastries, homemade breads, salads and sandwiches.  Indeed, in part because the two businesses shared such similar models, in 2016 Panera acquired a majority interest in Tatte. Panera has since sold its interest in Tatte, while Act III acquired total ownership of Tatte by the end of 2018.  In short, Act III and its brands are direct competitors of Panera.

17.     Act III's direct competition with Panera is rooted in both companies' origin.  Ron Shaich ("Shaich")—who is the Managing Partner of Act III—was the former President, CEO,

4

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

and Chairman of Panera.  Shaich stepped down as President of Panera in 2016.  Following

Panera's later acquisition, he stepped down as CEO in January 2018.  And in December 2018, his

position as Chairman of the Board of Directors ended.

18.     At the same time Shaich was winding down his role at Panera, he was ramping

up Act III, recruiting key talent from Panera.  In March 2018, Act III hired Keith Pascal

("Pascal"), who was the Chief Concept Advisor at Panera.  Pascal is now a Partner at Act III.  Act

III then hired Bryan Griffith ("Griffith"), the former Vice President of Café Systems, after he left

Panera in February 2018 at the same time as Pascal, ostensibly to work for a grocery chain, a

position he briefly held for a period of months.  Griffith is now the Chief Information Officer at

Act III.  Act III also hired Kat Ryder ("Ryder"), who was the Director of Café Systems for Panera

until October 2018.  She is now the Director of Technology and Ops Services for Tatte.

**Panera's Commitment to and Development of its Digital and Technological Systems**

19.     Panera is a leader in the food service industry in integrating technology into its

customers' experience, and has developed a clear vision as to how it will capitalize on technology to

continue to stay at the top of the industry.

20.     Panera prides itself on being several steps ahead of the game in developing its

technological systems, which ultimately drives a guest's experience with Panera.

21.     In approximately 2011, Panera unveiled its vision for "Panera 2.0," which consists

of enhanced to-go and eat-in options enabled by a series of integrated technologies.  "Panera 2.0"

is an integrated, comprehensive, end-to-end solution that aims to reduce wait times, improve

order accuracy, minimize or eliminate crowding, and create a more personalized experience.

"Panera 2.0" enables Panera to keep up with high transaction volumes and unrestrained

production demands, and thus has enhanced the guest experience.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

22.     The Panera technology platform of today now goes much further than the original technologies of Panera 2.0.  While the current integrated platform further improves the guest experience, it now has key components to improve the associate experience, the quality of Panera's cafe operations, as well as the effectiveness of operations.

23.     Panera made substantial investments initiating and implementing various digital and technology strategies and systems, including systems for digital ordering, digital payment, enhanced technology-based kitchen display systems and food production systems, digitally-based cafe management systems, master data management systems and quality assurance systems.

24.     Over the past decade, having invested significant capital in technology related to running its restaurants more efficiently and effectively, Panera understood that there was an opportunity to create value for shareholders and to lower overall service costs for Panera's cafes, by commercializing the technology for other restaurants.  This culminated in the creation of TechCo., a separate division within Panera that will commercialize the technology components Panera continues to develop to this day.  TechCo. leverages Panera's integrated platform of guest facing and cafe operating technologies, as well as the management systems.

25.     Panera believes that technology is a core competitive advantage and differentiator in the restaurant business, and Panera has become a leader in technology that is devoted to improving customer service and providing greater access and convenience.

26.     Panera understands that in order to continue to succeed and appeal to customers in such a competitive industry, it must have talented employees who can implement its clear vision for the future.  In that regard, Panera has focused on hiring and developing talented individuals who can grow to understand Panera's clear vision and implement its processes.

## Panera Hires Dobson, Gopalakrishnan, and Phillips

27.     On September 16, 2013, Panera hired Dobson as Director, Principal Software Engineer—Java.  Just prior to his resignation, he served as Panera's Director and Principal Architect of Software Engineering.

28.     On June 30, 2015, Panera hired Gopalakrishnan as Director, Mobile Apps/Web Unification.  At the time Gopalakrishnan tendered his resignation from Panera, he served as Panera's Director of Enterprise Architecture.

29.     October 21, 2002, Panera hired Phillips for the position of Café Support Systems Analyst.  When Phillips tendered his resignation from Panera on February 5, 2019, he served as Panera's Director of Delivery Systems.

30.     Dobson, Gopalakrishnan, and Phillips were key executives on Panera's IT team and were involved in strategy and decision-making at the highest level.  Dobson, Gopalakrishnan, and Phillips are all individuals that Panera identified as capable of taking Panera's vision for the future and implementing it in a way so that customers will tangibly reap the benefits.

### James Dobson

31.     As Panera's Director and Principal Architect of Software Engineering, Dobson ran all of Panera's café systems software development.  In the IT world, the term "architecture" essentially means how systems are designed to work.  Dobson had a great deal of influence in selecting the software programs used by Panera to maximize the effectiveness of its technology systems, including point-of-sale software, back-of-house software, kitchen display software, quality assurance software, data warehousing and data management software, software development tools, and even the software development languages.

32.     Dobson also worked on Panera's next generation technology concerning Panera's CORE application, which acts as the primary interface between e-commerce systems and

Panera's café systems. The CORE application works between the personal digital interface used by a customer, like a smartphone or computer (the e-commerce system) and the technology used and operated in Panera's cafes, like the kitchen display systems (the café systems).

**Krish Gopalakrishnan**

33.     As the Director of Panera's Enterprise Architecture, Gopalakrishnan was involved in all of Panera's technology systems. In addition, Gopalakrishnan was very involved in the design and implementation of Panera's enterprise data warehouse systems, both of which are proprietary to Panera. These systems are used to deepen Panera's relationship with its customers, such as understanding their general preference for an ordering channel, avoiding ingredients for allergies, or preferring items for dietary needs.

34.     Gopalakrishnan and his team helped maintain the enterprise data system and functions utilized within it. This allowed him access to, and he became intimately familiar with, Panera's highly confidential and proprietary sensitive business information.

35.     Further, as Panera's Enterprise Architect, Gopalakrishnan was heavily involved in all aspects of Panera's computer coding. Gopalakrishnan spearheaded the development and enhancement of Panera's existing code, as well as the development of new code for the company. Gopalakrishnan played a key role in the incubation and development of TechCo. and was involved in strategic discussions at the highest level.

**Kyle Phillips**

36.     On October 21, 2002, Phillips began at Panera in the position of Café Support Systems Analyst. On April 1, 2005, he was elevated to the Position of Lead—IT Field Services Support. And on January 12, 2006, he was promoted to the position of Manager, Field Services Deployment. In June 2009, Phillips was promoted to Analyst, IS Application Developer, and on December 9, 2011, he was elevated to Senior Manager, Senior Manager Commerce, IS Enterprise

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Systems. On February 14, 2014, he was then promoted to Director, Product Management. On November 14, 2015, Phillips was named Director, Delivery Systems.

37.     Phillips was one of only two employees at Panera who worked directly with Blaine Hurst ("Hurst"), now CEO of Panera, on the early portion of the transformational Panera 2.0 project. The knowledge Phillips gained from his work on the early stage project is invaluable and could only be replicated by virtue of Phillips having been a part of Hurst's first team on Panera 2.0.

38.      In light of Phillips' in-depth knowledge and understanding of Panera's 2.0 systems, Phillips' helped design and implement Panera's industry-leading delivery systems. For example, Panera's order-slotting technology is exceedingly advanced in the fast-casual food industry, and Phillips played a critical and pivotal role in its development.

39.     Given the important role Dobson, Gopalakrishnan, and Phillips played in implementing these programs, they were each privy to all of Panera's high-level discussions concerning its vision for how to continue to use technology to its advantage in the future. In other words, Dobson, Gopalakrishnan, and Phillips intimately know Panera's strategic technology plan for the next few years.

40.     Panera is a leader in the restaurant industry regarding its use of technology, and Panera's competitors are constantly trying to replicate Panera's technology systems as well as poach its employees. If a competitor was able to hire someone like Dobson, Gopalakrishnan, or Phillips, they would have inside information into Panera's specific plans and strategies regarding its implementation of highly proprietary technology-driven initiatives that focus on improving the customer experience.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

## Panera Seeks To Protect Its Confidential and Proprietary Information

41.     During their employment at Panera, Dobson, Gopalakrishnan, and Phillips had access to Panera's highly confidential and proprietary information.  For example, they had access to or authored Panera's system schematics, system design flows, architectural approach notes, and systems service-oriented approach standards, not to mention Panera's technology pricing and sourcing strategies.  It is impossible to quantify the value of Panera's best practices related to these systems.

42.     Panera takes several steps to keep this confidential and proprietary information secret, both internally and externally.  Panera employs a team of information security personnel whose jobs are dedicated to preventing the unauthorized access and release of Panera's trade secrets, proprietary data, and intellectual property.  Panera also encrypts all of the hard drives in the computers it uses and requires that employees use regularly updated passwords to access these computers.

43.     Additionally, upon joining Panera, all employees are required to review Panera's employee handbook, including the Company's Standards of Business Conduct, which governs employees' use and protection of Panera's Confidential Information.  Dobson, Gopalakrishnan, and Phillips agreed in writing to abide by these policies when they joined Panera.

44.     Panera marks highly confidential and sensitive materials that the Departed Employees had access to as "PANERA – PROPRIETARY AND CONFIDENTIAL" and cautions that they should not be distributed.  Panera likewise deploys a similar set of security measures relative to its email and other communication systems.

45.     Another key way that Panera protects its confidential and proprietary information is by requiring high-level employees to sign non-competition and confidentiality / non-disclosure agreements.  As Directors, Dobson, Gopalakrishnan, and Phillips were among the

10

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

approximately 30 members of Panera's IT department who signed non-competition and confidentiality / non-disclosure agreements.  This represents a small subset of the approximately 500 members of Panera's IT team.

46.     On or around November 10, 2017, Dobson signed the Panera, LLC, Confidential and Proprietary Information and Non-Competition Agreement (the "Non-Compete Agreement").

47.     On or around November 13, 2017, Phillips signed the Non-Compete Agreement.

48.     On or around November 13, 2017, Gopalakrishnan signed the Non-Compete Agreement.

49.     Panera provided Dobson, Gopalakrishnan, and Phillips with equity compensation, in the form of long-term incentive plans awarding stock grants valued at approximately 40-50% of their salary, along with enhanced duties and access in exchange for their execution of the non-competition and confidentiality/non-disclosure agreements.

50.     In a non-exclusive list of Panera competitors, these agreements specifically include two Act III entities, Cava Mezze Grill and Zoe's Kitchen.  Tatte is not expressly listed. But this is only because, at the time the agreements were executed in November 2017, Panera owned a significant interest in Tatte.  At the end of 2018, Act III took full ownership of Tatte.

### Panera's Former Employees Coordinate their Departure and Join Act III, a Direct Competitor of Panera

51.     Upon information and belief, in January or February 2019, or earlier, Act III extended offers to Dobson, Gopalakrishnan, and Phillips to join the company.

52.     On February 5, 2019, the Dobson, Gopalakrishnan, and Phillips nearly simultaneously informed Mike Prusaczyk, Mark Berinato, or John Meister that they were

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

resigning from Panera to take positions at Act III.  All of the resignations noted that the individuals were not open to negotiate any offer to stay at Panera.

53.     Upon information and belief, Act III hired Dobson, Gopalakrishnan, and Phillips to perform similar or identical work in similar or identical positions to the positions these employees held with Panera.

54.     Like Panera, ACT III, and the numerous branded restaurants it controls, occupies the fast-casual restaurant marketplace.

55.     Act III's fast-casual restaurants including, without limitation, Zoe's Kitchen, Cava, and Tatte frequently compete against Panera in the fast-casual restaurant space.

56.     Upon information and belief, Act III specifically hired Dobson, Gopalakrishnan, and Phillips because of their exposure to and experience developing and working with Panera's confidential and proprietary technology and information.

57.     Upon information and belief, Act III was aware that Dobson, Gopalakrishnan, and Phillips were subject to Non-Compete Agreements with Panera, and induced these employees to breach these Non-Compete Agreements for Act III's benefit.

58.     Upon information and belief, Act III was aware that Dobson, Gopalakrishnan, and Phillips have ongoing confidentiality obligations to Panera, and placed them in positions at Act III where these employees would inevitably breach those obligations by disclosing Panera's confidential and proprietary information, and otherwise induced these individuals to breach their obligations to Panera.

[Remainder of page intentionally left blank.]

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

### COUNT I – BREACH OF CONTRACT
#### (Against Dobson, Gopalakrishnan, and Phillips)

59.     Panera realleges and incorporates by reference paragraphs 1 through 58 of the Complaint.

60.     The Panera Non-Compete Agreements are valid contracts under Missouri law.

61.     By executing the foregoing agreements, Dobson, Gopalakrishnan, and Phillips agreed that they would not compete with Panera during their employment and for the twenty-six (26) week period (the "Restricted Period") following the termination of their employment with Panera.

62.     By signing the Panera Non-Compete Agreements, Dobson, Gopalakrishnan, and Phillips agreed that they would maintain the confidentiality of and not disclose Panera's confidential and proprietary information.

63.     Dobson, Gopalakrishnan, and Phillips also agreed that they would not use Panera's confidential and proprietary information other than on Panera's behalf.

64.     Furthermore, Dobson, Gopalakrishnan, and Phillips agreed that if they left the employ of Panera, they would promptly return to Panera all of its confidential information and any materials that may contain, or be derived from, Panera's confidential information.

65.     Dobson, Gopalakrishnan, and Phillips breached their Panera Non-Compete Agreements by accepting an offer to work for Act III, a direct competitor of Panera.

66.     Dobson, Gopalakrishnan, and Phillips breached their Panera Non-Compete Agreements by failing to return Panera's confidential and proprietary information, by disclosing Panera's confidential and proprietary information to Act III, and by using Panera's confidential and proprietary information for the benefit of Act III.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

67.     Dobson, Gopalakrishnan, and Phillips' wrongful conduct in breaching their non-competition obligations to Panera has and will continue to cause Panera irreparable harm that cannot be remedied by monetary damages alone.  As such, Panera is entitled to preliminary and permanent injunctive relief to restrain Dobson, Gopalakrishnan, and Phillips from any further or future violations of their Non-Compete Agreements including, without limitation, their continued employment with Act III.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Act III)

68.     Panera realleges and incorporates by reference paragraphs 1 through 67 of the Complaint.

69.     During their employment with Panera, Dobson, Gopalakrishnan, and Phillips entered into Non-Compete Agreements.

70.     Such contracts are valid and enforceable contracts under Missouri law.

71.     Upon information and belief, Act III was aware that Dobson, Gopalakrishnan, and Phillips had contracts with Panera that restricted their competitive activities and protected the confidentiality of Panera's confidential and trade secret information.

72.     Upon information and belief, Act III wrongfully solicited Dobson, Gopalakrishnan, and Phillips because of the information these individuals possessed regarding Panera's confidential information and trade secrets.

73.     Upon information and belief, Act III intentionally and unjustifiably induced Dobson, Gopalakrishnan, and Phillips to breach their Non-Compete Agreements with Panera by hiring these individuals during the Restricted Period and inducing them to disclose confidential and trade secret information for Act III's benefit.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

74.     Dobson, Gopalakrishnan, and Phillips did in fact breach their contracts, by working for Act III during the restricted period and by improperly retaining, disclosing, and using Panera's confidential and trade secret information.

75.     Panera has been harmed and will continue to be irreparably injured by Act III's actions.

### COUNT III – CIVIL CONSPIRACY
(Against All Defendants)

76.     Panera realleges and incorporates by reference paragraphs 1 through 74 of the Complaint.

77.     In their positions at Panera, Dobson, Gopalakrishnan, and Phillips were intimately involved in many of Panera's highly proprietary technology initiatives and were privy to confidential information and trade secrets.  In furtherance of a conspiracy, Dobson, Gopalakrishnan, and Phillips concealed their anticipated departure from Panera until every employee leaving Panera for Act III submitted their notice of resignation on the same day.

78.     Upon information and belief, Act III was aware of the intimate knowledge and involvement Dobson, Gopalakrishnan, and Phillips had in developing Panera's trade secrets and confidential proprietary information and technology.

79.     Upon information and belief, Act III knew that Dobson, Gopalakrishnan, and Phillips signed an agreement whereby they could not share or use Panera's confidential and proprietary information.

80.     Upon information and belief, Act III conspired with Dobson, Gopalakrishnan, and Phillips to breach the various agreements that they have with Panera, leading to the misappropriation of Panera's confidential and trade secret information.

Case: 4:19-cv-00276 Doc. #: 1-1 Filed: 02/21/19 Page: 16 of 23 PageID #: 16
Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

81. Upon information and belief, Act III conspired with Dobson, Gopalakrishnan, and Phillips to breach their confidentiality obligations to Panera, leading to the misappropriation of Panera's confidential and trade secret information.

82. Upon information and belief, Defendants still have access to Panera's confidential and trade secret information and continue to use such confidential and trade secret information on Act III's behalf.

83. Panera has been harmed and will continue to be irreparably injured by Defendants' concerted actions. As such, Panera is entitled to preliminary and permanent injunctive relief.

## COUNT IV – DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et seq.*)
### (Against All Defendants)

84. Panera realleges and incorporates by reference paragraphs 1 through 83 of the Complaint.

85. Panera's proprietary and confidential technology, strategies, and initiatives including, without limitation, its algorithms, architectural designs, plans, strategies, and code, constitute protectable trade secrets within the meaning of the Defend Trade Secrets Act. Panera has expended considerable resources to design, develop, and implement this confidential and proprietary trade secret information, and it are not readily ascertainable through proper means.

86. Panera derives economic value from the secrecy of technology, and by the lack of access to this information by Panera's competitors. Panera's technology and technology initiatives including, without limitation, Panera 2.0 and TechCo., have and will continue to position Panera ahead of its competitors. Panera expects to continue to derive further value from its technology and technology initiatives.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

87.     Panera took reasonable steps to protect these trade secrets, including, without limitation, (i) employing an information security team dedicated to preventing unauthorized access and disclosure of Panera's trade secrets, (ii) encrypting hard drives on all Panera computers, (iii) requiring employees to regularly update passwords, (iv) marking highly confidential and sensitive types of documents as "PANERA – PROPRIETARY AND CONFIDENTIAL" and indicating that they should not be distributed, (v) requiring all employees to review Panera's employee handbook, including the Company's Standards of Business Conduct, which governs employees' use and protection of Panera's confidential and proprietary information, and (vi) requiring select member of its IT team to execute Non-Competition Agreements as a condition to their access to such information.

88.     The trade secrets that Dobson, Gopalakrishnan, and Phillips took from Panera are integral to Panera's competitive advantage in the marketplace, and if the information becomes generally known to Panera's competitors, Panera stands to suffer irreparable harm.

89.     Upon information and belief, Dobson, Gopalakrishnan, and Phillips retained Panera's trade secrets and, upon termination of their employment with Panera, and employment with Act III, threaten to disclose and use or have already disclosed and used this information.

90.     Likewise, Act III is attempting to or has already succeeded in inducing Dobson, Gopalakrishnan, and Phillips into breaching their obligations not to disclose or use Panera's trade secrets.

91.     Further, upon information and belief, Act III's Managing Partner, Ron Shaich, already took highly confidential, proprietary, and trade secret information belonging to Panera, immediately after stepping down as Panera's CEO.

92.     This conduct has or will enable Act III to misappropriate, disclose, and use Panera's confidential and proprietary technology and technology initiatives and, therefore,

compete unfairly against Panera by benefitting from the millions of dollars that Panera invested in its unparalleled technology.

93.     Panera has been harmed and will continue to be irreparably injured by Defendants' violation of this statute unless and until this Court enters a preliminary and permanent injunction, enjoining and restraining Defendants from using Panera's trade secrets.

### COUNT V – MISSOURI UNIFORM TRADE SECRETS ACT
### (MO. REV. STAT. § 417.450, *et seq.*)
(Against All Defendants)

94.     Panera realleges and incorporates by reference paragraphs 1 through 93 of the Complaint.

95.     Panera has expended substantial time, effort, and monetary resources in the design and development of trade secrets.

96.     Panera derives independent economic value and a competitive advantage from these trade secrets.

97.     At all relevant times, Panera used and is using reasonable efforts to protect the confidentiality of these trade secrets.

98.      Defendants knew that the information entrusted to Dobson, Gopalakrishnan, and Phillips was confidential and that trade secret information was not to be revealed outside of Panera.

99.     Defendants knew that the information was a valuable commercial asset of Panera, and that Panera had expended much time, effort, and money in developing the trade secret information.

100.      Panera is informed and believes, and based thereon alleges, that at the time Defendants copied and/or used Panera's trade secret information, Act III knew that it had

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

acquired the trade secret information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

101.    By engaging in the conduct described herein, Defendants have misappropriated Panera's trade secrets in violation of the Missouri Uniform Trade Secrets Act, MO. REV. STAT. § 417.453.

102.    Panera has been and continues to be damaged as a direct and proximate result of Defendants' misappropriation, including but not limited to loss in value of its trade secrets.

103.    The damage that Panera has suffered and continues to suffer from Defendants' unlawful actions is irreparable; Panera has no adequate remedy at law; and Defendants' misappropriation of Panera's trade secrets will continue to cause such irreparable harm unless and until this Court orders Defendants to cease such misappropriation.

104.    Upon information and belief, Defendants' misappropriation of Panera's trade secrets was and is willful and malicious, thereby entitling Panera to enhanced damages and attorneys' fees pursuant to the Missouri Uniform Trade Secrets Act, MO. REV. STAT. § 417.457.

## COUNT VI – UNJUST ENRICHMENT/EQUITABLE FORFEITURE
### (Against All Defendants)

105.    Panera realleges and incorporates by reference paragraphs 1 through 104 of the Complaint.

106.    Upon information and belief, Dobson, Gopalakrishnan, and Phillips began taking actions on behalf of and for the benefit of Act III while still employed by Panera.

107.    Panera compensated Dobson, Gopalakrishnan, and Phillips during this time period, despite that fact these employees were working for and otherwise acting for the benefit of competing venture Act III.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

108. Thus, Dobson, Gopalakrishnan, and Phillips were unjustly enriched by receiving compensation for time worked when they were actually working in direct competition with Panera.

109. In addition, Act III employed Dobson, Gopalakrishnan, and Phillips to do the same or similar job they performed at Panera. Defendants are using the confidential and proprietary information that Dobson, Gopalakrishnan, and Phillips gained access to as employees of Panera for Act III to unfairly compete with Panera.

110. As a result, Defendants have been unjustly enriched and have benefitted at the direct expense of Panera. Panera has been harmed and will continue to be irreparably injured by Defendants' actions. As such, Panera is entitled to a temporary restraining order and preliminary and permanent injunctive relief.

**COUNT VII – PERMANENT INJUNCTION**
**(Against All Defendants)**

111. Panera realleges and incorporates by reference paragraphs 1 through 110 of the Complaint.

112. As set forth herein, Defendants' misappropriation of Panera's trade secrets and wrongful conduct in violation of Dobson, Gopalakrishnan, and Phillips' contractual obligations and various laws have and will continue to cause Panera to suffer irreparable harm for which there is no monetary remedy.

113. Accordingly, Panera is entitled to a permanent injunction to stop Act III's unfair competition, Dobson, Gopalakrishnan, and Phillips' breach of their Non-Compete Agreements, Defendants' unlawful use and/or disclosure of Panera's confidential and proprietary information, and further irreparable injury to Panera.

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Panera demands a trial by jury on all issues so triable.

## PRAYERS FOR RELIEF

**WHEREFORE**, Panera, LLC respectfully requests this Court to:

A. Enter a preliminary injunction and, after trial, a permanent injunction, ordering Dobson, Gopalakrishnan, and Phillips to:

 (i) Cease and desist from working for Act III for a period of twenty-six (26) weeks pursuant to their non-competition obligations under their respective Panera Non-Compete Agreements;

B. Enter a preliminary injunction and, after trial, a permanent injunction, ordering Defendants to:

 (i) Cease and desist from acting in concert with, engaging in, tolerating willfully, acquiescing in, or accepting 's Dobson, Gopalakrishnan, and/or Phillips' violation of their respective confidentiality obligations to Panera;

 (ii) Cease and desist from directly or indirectly using or disclosing Panera's confidential and proprietary trade secret information;

 (iii) Forfeit to Panera all profits or other monetary benefits it obtained from the use of Panera's confidential and proprietary trade secret information;

 (iv) Preserve all evidence relevant to this dispute and not to engage in any direct or indirect destruction or deletion of evidence, including electronic evidence and metadata;

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

(v)     Return to Panera any and all Confidential Information in the custody, control, or possession of Defendants;

(vi)     Identify any of Panera's confidential and proprietary trade secret information that has been disclosed by anyone and the names of any individual to whom such disclosure was made; and

(vi)     Preserve and retain all documents and electronically stored information potentially relevant to the claims raised in Panera's Complaint.

C.     Order expedited discovery;

D.     Enter a judgment against Defendants and in favor of Panera on all Counts;

E.     Award Panera its costs and reasonable attorney's fees as provided for by Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.457; and,

F.     Award such other and further relief as the Court may find just and proper under the circumstances.

**[Signature block on next page.]**

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Respectfully Submitted,

PANERA, LLC,

By its attorneys:

  /s/      Bret A. Cohen
Bret A. Cohen, Esq. (MO Bar # 42368)
Patrick T. Uiterwyk, Esq.
(*pro hac vice admission pending*)
Matthew T. Brown, Esq.
(*pro hac vice admission pending*)
NELSON MULLINS RILEY & SCARBOROUGH, LLP
One Post Office Square | 30th Floor
Boston, Massachusetts 02109
Telephone: (617) 217-4700
Facsimile: (617) 217-4710
bret.cohen@nelsonmullins.com
patrick.uiterwyk@nelsonmullins.com
matthew.brown@nelsonmullins.com

Jessica L. Liss, Esq. (MO Bar # 51331)
JACKSON LEWIS P.C.
222 S. Central Avenue, Suite 900
St. Louis, Missouri 63105
Telephone: (314) 827-3939
Facsimile: (314) 827-3940
jessica.liss@jacksonlewis.com

Dated: February 21, 2019

6/8/2020    Case: 4:20-cv-01068-SEP    Doc. #: 1-11  > Fresh Express Incorporated Filed: 08/13/20    Page: 116 of 126    PageID #: 625

2022-CC01133

You are viewing an archived web page, collected at the request of U.S Food and Drug Administration    hide
using Archive-It. This page was captured on 19:43:14 Jan 12, 2017, and is part of the FDA.gov
collection. The information on this web page may be out of date. See All versions of this archived page.
Found 0 archived media items out of 0 total on this page.



**FDA**

# Exhibit C

### Archived Content
The content on this page is provided for reference purposes only. This content has not
been altered or updated since it was archived.

Search Archive

Home Inspections, Compliance, Enforcement, and Criminal Investigations Compliance Actions and Activities Warning
Letters 2010

## Inspections, Compliance, Enforcement, and Criminal Investigations

### Fresh Express Incorporated 10/6/10



**Department of Health and Human Services**

Public Health Service
Food and Drug Administration
San Francisco District
1431 Harbor Bay Parkway
Alameda. CA 94502-7070
Telephone: 510/337-6700

**WARNING LETTER**

**Via UPS**

October 6, 2010

Fernando Aguirre, President and CEO
Chiquita Brands International, Inc. and Fresh Express, Incorporated
250 East Fifth Street
Cincinnati, OR 45202

Dear Mr. Aguirre:

Starting on May 21, 2010 and ending on June 10, 2010, the Food and Drug Administration (FDA) inspected your
food manufacturing facility located at 900 E. Blanco Road, Salinas, California. During this inspection, FDA
investigators collected labels for your products and reviewed their labeling at http://www.chiquita.com[1]. Based
on our review, we have concluded that your Chiquita brand "Pineapple Bites with Coconut" and "Pineapple Bites"
products are misbranded in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and the applicable
regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101). You can find the Act and FDA
regulations through links at FDA's Internet home page at http://www.fda.gov[2].

Specifically, your "Pineapple Bites with Coconut" product is misbranded within the meaning of Section 403(a) of
the Act [21 U.S.C. § 343(a)] in that its statement of identity, "Pineapple Bites with Coconut", is false and
misleading. The ingredient statement for this product states that it is made with coconut; however, our
investigation determined that this product is made with a coconut flavor spray. The characterizing flavor of your
Pineapple with Coconut product must be identified in accordance with 21 CFR 101.22(i)(1)(iii) (for example.
"coconut flavor").

Your "Pineapple Bites" and "Pineapple Bites with Coconut" products are misbranded within the meaning of Section
403(r)(1)(A) of the Act [21 U.S.C. § 343(r)(1)(A)] because their labeling bears nutrient content claims but the
products do not meet the requirements for the claims.
Specifically, their labeling includes the claim "Plus ... Antioxidants." However, this claim does not include the
names of the nutrients that are the subject of the claim or, alternatively, link the term "antioxidants" by a symbol
(e.g, an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label
followed by the name or names of the nutrients with recognized antioxidant activity. 21 CFR 101.54(g)(4). Your

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

use of this antioxidant claim therefore misbrands your products under section 403(r)(2)(A)(i) of the Act [21 U.S.C. § 343(r)(2)(A)(i)].

Your "Pineapple Bites" and "Pineapple Bites with Coconut" products also bear the claim "Plus Phytonutrients." "Phytonutrients" are not nutrients for which a recommended daily intake (RDI) or daily recommended value (DRV) has been established. Therefore, nutrient content claims regarding "phytonutrients" are not authorized and further misbrand your products under section 403(r)(2)(A)(i) of the Act [21 U.S.C. § 343(r)(2)(A)(i)]. To the extent phytonutrients are intended to be the basis for an antioxidant nutrient content claim, that use would violate FDA regulations for the same reason and because phytonutrients are not recognized as having antioxidant activity. 21 CFR 101.54(g)(1) and (2).

Both your "Pineapple Bites" and "Pineapple Bites with Coconut" products also bear the statement "Only 40 Calories." This statement implies that the products are "low calorie" foods. A "low calorie" claim may be made if a food with a reference amount customarily consumed (RACC) greater than 30 grams (g) or greater than 2 tablespoons does not provide more than 40 calories per RACC. 21 CFR 101.60(b)(2)(i)(A). The RACC established for pineapple is 140 g. See 21 CFR 101.12(b) (Table 2, Fruits and Fruit Juices, All other fruits fresh, canned, or frozen).

The nutrition information for both products states that there are 40 calories per 1 piece (80 g) of product; this equals about 70 calories per RACC. Therefore, under 21 CFR 101.13(i)(2), the products are required to carry a disclaimer adjacent to the claim, e.g., "Only 40 calories per serving, not a low calorie food". Because your products fail to bear the required disclaimer, they are misbranded within the meaning of section 403(r)(1)(A) of the Act.

The "Pineapple Bites" and "Pineapple Bites with Coconut" products are further misbranded within the meaning of section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the chemical preservatives ascorbic acid and citric acid but their labels fail to declare these preservatives with a description of their functions. 21 CFR 101.22. Further, the ingredients ascorbic acid and citric acid must be declared by their common or usual names. 21 CFR 101.4(a).

This letter is not intended to be an all-inclusive review of your firm's products and processes. It is your responsibility to ensure that your firm and your products comply with the Act and FDA, regulations. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory action without further notice. For instance, we may take further action to seize your product or enjoin your firm from operating.

We also note that, FDA (through its contractor) obtained two samples of Fresh Express Hearts of Romaine, the testing of which yielded human pathogens. One sample was found to contain *Salmonella Anatum*; another sample was found to contain *E. coli 0157:H7*. We acknowledge that you issued letters to your customers in an effort to recall affected products. However, FDA recommends that you review your firm's criteria for receipt of raw product, your procedures for ensuring that wash, flume and processing water do not contaminate your products and any other conditions and practices that may relate to the cause of the contamination.

We further acknowledge your June 25, 2010 response to the Good Manufacturing Practices violations cited in the FDA Form 483 regarding this inspection. In your response, you committed to:

- Retrain employees to replace or sanitize their gloves after contacting unsanitized surfaces;

- Include the dryer hoist controls and the equipment control panels that involve direct employee contact in your daily wash and sanitation procedures;

- Create a new storage system for aprons, gloves, and sleeve guards for times during manufacturing when they are not in use; and

- Modify your cutting surface inspection and replacement program so that cutting surfaces will be changed after every **(b)(4)** of use.

However, you did not provide documentation to demonstrate that these corrections have been made. You also did not address the observation that your technician improperly read the free chlorine indicator tests in the flume water. Please provide this information and documentation in your response to this Warning Letter.

In addition to the labeling issues identified above, we note that the available labeling space is at least 6" in height; therefore, the size of the nutrition information declared on these packages is not appropriate and does not meet the formatting requirements under 21 CFR 101.9(d), including hairline and footnote requirements. We note that since some of the nutrients are at insignificant levels, a shortened version of the Nutrition Facts panel may be used, e.g., the statement "Not a significant source of dietary fiber", at the bottom of the table of nutrient values as allowed under 21 CFR 101.9(c).

Please notify this office in writing within fifteen (15) working days from the date you receive this letter of the specific steps you have taken to correct the noted violations, including an explanation of how you plan to prevent these violations, or similar violations, from occurring again. Please include documentation of the corrective actions you have taken. If your planned corrections will occur over time, please include a timetable for

implementation of those corrections. If corrective action cannot be completed within 15 working days, state the reason for the delay and the time within which the corrections will be completed.

Your response should be sent to:

> Darlene B. Almogela
> Director of Compliance
> United States Food and Drug Administration
> 1431 Harbor Bay Parkway
> Alameda, CA 94502

If you have any questions about the content of this letter please contact Sergio Chavez, Compliance Officer, at 510-337-6886.

/s/


Barbara Cassens
District Director


Page Last Updated: 10/08/2010
Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisye | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

     Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Site Map Nondiscrimination Website Policies



U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA



For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

U.S. Department of Health & Human Services

**Links on this page:**

1. https://wayback.archive-it.org/7993/20170112194314/http://www.chiquita.com/

2. https://wayback.archive-it.org/7993/20170112194314/http://www.fda.gov/

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

2022-CC01133

You are viewing an archived web page, collected at the request of U.S Food and Drug Administration (//archive-it.org/organizations/1137) using Archive-It (//archive-it.org/). This page was captured on 8:01:20 Sep 08, 2019, and is part of the FDA.gov (//archive-it.org/public/collection.html?id=7993) collection. The information on this web page may be out of date. See All versions (https://wayback.archive-it.org/7993/*/https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/wonder-natural-foods-corp-07132015) of this archived page. Found 0 archived media items out of 0 total on this page.    [hide]

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

WARNING LETTER

## Wonder Natural Foods Corp.

**JULY 13, 2015**

# Exhibit D

# Wonder Natural Foods Corp. - 07/13/2015

**Recipient:**

Wonder Natural Foods Corp.

United States

**Issuing Office:**

Center for Food Safety and Applied Nutrition

United States



**Department of Health and Human Services**

Public Health Service
Food and Drug Administration
College Park, MD  20740

July 13, 2015

**WARNING LETTER**

**VIA OVERNIGHT MAIL**

Mr. Stuart Lasdon, Owner
Wonder Natural Foods Corp.
30 Blank Ln
Watermill, NY 11976

Re: 460929

Dear Mr. Lasdon,

The Food and Drug Administration (FDA) reviewed the labels for your Better'n Peanut Butter Original (16 oz.) product in February 2015. The label for this product directs the consumer to your website at the Internet address www.betternpeanutbutter.com. We examined your website in June of 2015. Based on our review, we have concluded that this product is misbranded within the meaning of section 403 of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 343] and its implementing regulations found in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101). You can find the Act and FDA regulations through links on FDA's home page at http://www.fda.gov (https://wayback.archive-it.org/7993/20190908080120/http://www.fda.gov/).

The significant violations are as follows:

1.   Your Better'n Peanut Butter Original (16 oz.) product is misbranded within the meaning of section 403(r)(1)(A) of the Act [21 U.S.C. § 343(r)(1)(A)] because the product label and labeling bear nutrient content claims, but the product does not meet the requirements to make such claims.

Under section 403(r)(1)(A) of the Act, a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation authorizing the use of such a claim. Characterizing the level of a nutrient on the food labeling of a product without complying with the specific requirements pertaining to the nutrient content claim for that nutrient misbrands the product under section 403(r)(1)(A) of the Act. Specifically,

a. Your website at www.betternpeanutbutter.com/index.php bears an implied nutrient content claim because it bears a statement suggesting that the product may be useful in maintaining healthy dietary practices, and that statement is made in connection with a claim or statement about a nutrient. The labeling of your Better'n Peanut Butter Original (16 oz.) product on your website bears the

claim "healthy" in connection with the statement "low fat, low calorie;"; however, the product does not meet the requirements for use of a "healthy" nutrient content claim that are set forth in 21 CFR 101.65(d)(2). In accordance with 21 CFR 101.65(d)(2)(i)(F), you may use the term "healthy" as an implied nutrient content claim on the label or in the labeling of certain foods provided that the food, among other things, contains at least 10% of the RDI or the DRV per Reference Amount Customarily Consumed (RACC) for one or more of vitamin A, vitamin C, calcium, iron, protein, or fiber. According to the Nutrition Facts panel, your Better'n Peanut Butter Original (16 oz) product does not contain at least 10 percent of the RDI or the DRV per RACC for any of these nutrients. Accordingly, your product does not meet the requirements for use of a "healthy" nutrient content claim on a food label [21 CFR 101.65(d)(2)]. Your product is thus misbranded within the meaning of section 403(r)(1)(A) of the Act.

b. Your website at www.betternpeanutbutter.com/index.php bears the nutrient content claim "low calorie;"; however, the product does not meet the requirements to bear the claim because it provides more than 40 calories per RACC and per 50g [21 CFR 101.60(b)(2)(i)(B)].

c. The label bears the nutrient content claim "No Cholesterol." As required by 21 CFR 101.13(e)(2) and 21 CFR 101.62(d)(1)(i)(D), if the food contains less than 2 mg of cholesterol per RACC without the benefit of special processing, alteration, formulation or reformulation to lower cholesterol content, a claim about the lack of cholesterol in the food must disclose that cholesterol is not usually present in the food (e.g., "applesauce, a cholesterol-free food"). Peanut butter and peanut spread products do not contain cholesterol, and therefore the label of your product should disclose that cholesterol is not usually present in the food.

2. Your product is misbranded within the meaning of section 403(i)(1) of the Act in that "Better'n Peanut Butter" is not an appropriate statement of identity for a food [21 CFR 101.3(a)].

3. Your product is misbranded within the meaning of 403(i)(2) of the Act in that the ingredients are not declared in accordance with 21 CFR 101.4. Ingredients must be listed by their common or usual name in descending order of predominance by weight. Specifically:

a. The ingredient list declares "peanuts (as defatted peanut flour, peanut butter and natural peanut oils)." As stated above, according to the ingredient statement, this product does not appear to be made using peanuts as an ingredient. The referenced ingredient declaration is not allowed under 21 CFR 101.4(a)(1), which requires that ingredients are listed by common or usual name in descending order of predominance. Sub-ingredients of multi-component foods can be declared parenthetically under 21 CFR 101.4(b)(2). However, defatted peanut flour, peanut butter and natural peanut oils are not sub-ingredients of peanuts. The common or usual names of the ingredients actually used to make this product appear to be defatted peanut flour, peanut butter and peanut oil. Furthermore, if any of these ingredients are multi-component ingredients (e.g., peanut butter), the sub-ingredients must be declared in accordance with 21 CFR 101.4(b)(2).

b. "Grain syrup" is not an adequate common or usual name for an ingredient.

c. There is no provision in 21 CFR 101.4 that allows for the combined declaration of "natural colors and flavors." In fact, we note that any added color is artificially coloring a food; hence the labeling provisions under 21 CFR 101.22(k)(2).

4. Your product is misbranded under 403(i)(1) and 403(g)(l) of the Act because it purports to be and is represented as peanut spread and peanut butter, in the labeling. The website at www.betternpeanutbutter.com/nutrition.php characterizes the product as "an all-natural, delicious peanut butter spread," and "diet peanut butter." The product does not meet the description for peanut spread or the requirements in the standard of identity for peanut butter. Peanut spread must meet certain requirements for protein content as described in 21 CFR 102.23(b)(1)(i) or (ii). Section 102.23(b)(1)(i) requires protein content of at least 24 percent by weight (if the overall biological quality of the protein contained in the product is at least 68 percent that of casein). For a 32 gram serving, the protein content would be between 7 to 8 grams. Better'n Peanut Butter lists 4 grams of protein per 32 gram serving. Section 102.23(b)(l)(ii) requires a minimum of 16.6 percent by weight of protein (if the overall biological quality of the protein contained in the product is equal to or greater than that of casein). For a 32 gram serving, this protein content would be 5 grams. The standard for peanut butter in 21 CFR 164.150 requires the food to contain at least 90 percent peanut ingredients, which are specified in 21 CFR 164.150(b). Defatted peanut flour, which appears to be the most predominant ingredient, is not an acceptable peanut ingredient under the standard.

The above violations are not meant to be an all-inclusive list of violations that may exist in connection with your products. It is your responsibility to ensure that your products comply with the Act and its implementing regulations. You should take prompt action to correct the violations cited in this letter. Failure to promptly correct these violations may result in FDA taking regulatory action without further notice, such as seizure and/or injunction.

In addition, we offer the following comments:

- We note that the panel to the right of the principal display panel (PDP) bears the nutrient content claim "40% fewer calories," Based on your product name, "Better'n Peanut Butter," we understand the reference food for this claim to be peanut butter. However, as discussed above, "Better'n Peanut Butter" is not an appropriate statement of identity for a food. Be advised that for a "fewer calories" claim, the identity of the reference food must appear in immediate proximity to the most prominent such claim as required by 21 CFR 101.60(b)(4)(ii)(A).

- We note that the PDP and the panel to the right of the PDP bear the nutrient content claim "85% less fat." Based on your product name, "Better'n Peanut Butter," we understand the reference food for this claim to be peanut butter. However, as discussed above, "Better'n Peanut Butter" is not an appropriate statement of identity for a food. Be advised that for a "less fat" claim, the identity of the reference food must appear in immediate proximity to the most prominent claim as required by 21 CFR 101.62(b)(4)(ii)(A).

- We note that your website makes the claim "no refined sugars." The intent of your claim may not be clear to consumers and may mislead those who are seeking products that are sugar-free or contain no added sugar. We recommend that you clarify the meaning of your claim.

- The "made with real peanuts" statement is potentially misleading to consumers because it may suggest that peanuts are directly added to the product or that you use peanuts as starting ingredients to manufacture this product. Based on the ingredient declaration, it appears that this

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

is not the case. It appears that you are starting with processed ingredients derived from peanuts such as defatted peanut flour, peanut butter and peanut oil. Therefore, we suggest that the statement be clarified.

- We note that the label bears the claim "No Preservatives." We note that if any ingredients such as tocopherol or sodium ascorbate are being used as preservatives, this statement would be false and cause the product to be misbranded under 403(a)(l).

- We note that the nutrition information is provided in a linear format. As specified in 21 CFR 101.9(j)(13)(ii), nutrition information may be provided in a tabular or linear (i.e., string) format rather than in vertical columns if the product has a total surface area available to bear labeling of less than 12 square inches, or if the product has a total surface area available to bear labeling of 40 or less square inches and the package shape or size cannot accommodate a standard vertical column or tabular display on any label panel. Nutrition information may be given in a linear fashion only if the label will not accommodate a tabular display.

- The label uses the term "dehydrated cane juice" in the ingredient list. FDA is in the process of developing guidance on the common or usual name of this ingredient. We published a draft guidance for comment in October 2009 (http://www.fda.gov/food/guidanceregulation/guidancedocumentsregulatoryinformation/labelingnutrition/ucm181491.htm (/7993/20190908080120/https://www.fda.gov/food/guidance-documents-regulatory-information-topic/guidance-industry-ingredients-declared-evaporated-cane-juice)), and on March 5, 2014, we reopened the comment period for this draft guidance until May 5, 2014. We intend to issue final guidance after reviewing the comments received. We recommend that you check the FDA website (www.fda.gov) regularly or sign up for email updates to keep up with the latest regulatory developments, including the issuance of that final guidance. You can subscribe to email updates from FDA's Center for Food Safety and Applied Nutrition (CFSAN) at https://public.govdelivery.com/accounts?USFDA/subscriber/new?topic_id=USFDA_26 (https://wayback.archive-it.org/7993/20190908080120/https://public.govdelivery.com/accounts?USFDA/subscriber/new?topic_id=USFDA_26).

- The information panel contains intervening material in the ingredients list such as the words "pure" and "natural" preceding the words "water" and "peanut oils."

- The street address must be included as part of the place of business unless it is shown in a current city directory or telephone directory [21 CFR 101.5(d)].

- We note that the nutrition and ingredient information provided on the website (www.betternpeanutbutter.com/nutrition.php) for "Regular Creamy" differs from the information provided on your "Original" label. For example, on the website, the calories from fat are declared as 18 and the ingredient list includes rice syrup, soy flour, tapioca starch, paprika & annatto, and vitamins E & C (antioxidants). Alternatively, on your product label, the calories from fat is declared as 20 and the ingredient list includes peanut oil, grain syrup, natural colors, tocopherol (vitamin E) and sodium ascorbate (vitamin C). If this is the same product, we recommend that you revise any errors that appear on the label or labeling so that the information is consistent and accurate.

- The nutrition information on the website is missing declarations of trans fat, polyunsaturated fatty acids, monounsaturated fatty acids, and cholesterol amounts [21 CFR 101.9(c)(2) and (3)]. Dietary fiber is not declared in the appropriate order or indented [21 CFR 101.9(c)].

You should respond in writing within 15 working days from receipt of this letter. Your response should outline the actions you plan to take in response to this letter, including an explanation of each step being taken to correct the current violations and prevent their recurrence. Include any documentation necessary to show that correction has been achieved. If you cannot complete corrective action within 15 working days, state the reason for the delay and the time within which you will complete the corrections.

You should direct your written reply to Anam Drumheller, Food and Drug Administration, Center for Food Safety and Applied Nutrition, 5100 Paint Branch Parkway, Office of Compliance (HFS-608), Division of Enforcement, College Park, Maryland 20740-3835. If you have any questions regarding this letter, you may contact Ms. Drumheller via email at anam.drumheller@fda.hhs.gov (mailto:anam.drumheller@fda.hhs.gov).

Sincerely,
/S/
William A. Correll, Jr.
Director
Office of Compliance
Center for Food Safety
    and Applied Nutrition

cc: FDA New York District

## Close Out Letter

- Wonder Natural Foods Corp. - Close Out Letter 11/10/15 (/7993/20190908080120/https://www.fda.gov/wonder-natural-foods-corp-close-out-letter-111015)

---

⬤ More Warning Letters (/7993/20190908080120/https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

Electronically Filed - City of St. Louis - June 10, 2020 - 01:55 PM

Electronically Filed - City of St. Louis - June 19, 2020 - 11:09 AM

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

RANDALL SALLY, on behalf of himself )
and all others similarly situated, )
)
          Plaintiff, )     Cause No. 2022-CC01133
)
vs. )     Division:
)
PANERA BREAD COMPANY, a/k/a )
SAINT LOUIS BREAD CO. and )
PANERA, LLC, )
)
          Defendants. )

## **ENTRY OF APPEARANCE AS CO-COUNSEL**

COMES NOW Adam M. Goffstein and hereby enters his appearance as co-counsel on

behalf of Plaintiff Randall Sally in the above-styled matter.

Respectfully submitted,

GOFFSTEN LAW, LLC

/s/ Adam M. Goffstein
Adam M. Goffstein, #45611
7777 Bonhomme, Suite 1910
St. Louis, Missouri 63105
Phone:  (314) 725-5151
Fax:  (314) 455-7278
adam@goffsteinlaw.com

Attorney for Plaintiff

Based on the Supreme Court Rules governing eFiling, an eService email has been issued to the following parties:


SERVICE PARTY:    DANIEL JOHN ORLOWSKY, Attorney for Plaintiff
SERVICE EMAIL:    dan@orlowskylaw.com

Electronically Filed - City of St. Louis - June 19, 2020 - 11:09 AM

Cole County Sheriff

# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| Judge or Division:<br>REX M BURLISON | Case Number: 2022-CC01133 | Special Process Server 1 |
|---|---|---|
| Plaintiff/Petitioner:<br>RANDALL SALLY | Plaintiff's/Petitioner's Attorney/Address<br>DANIEL JOHN ORLOWSKY<br>7777 BONHOMME AVE<br>SUITE 1910<br>ST. LOUIS, MO 63105 | Special Process Server 2<br><br>Special Process Server 3 |
| vs. | | |
| Defendant/Respondent:<br>PANERA BREAD COMPANY | Court Address:<br>CIVIL COURTS BUILDING | |
| Nature of Suit:<br>CC Other Tort | 10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** PANERA BREAD COMPANY
**Alias:**

**221 BOLIVAR STREET**
**R/A CSC LAWYERS INC SERV**
**JEFFERSON CITY, MO 65101**
*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**July 7, 2020**

_____
Date

_Thomas Kloeppinger_
_____
Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

Cole County Sheriff

# IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| | | |
|---|---|---|
| Judge or Division:<br>REX M BURLISON | Case Number: **2022-CC01133** | Special Process Server 1 |
| Plaintiff/Petitioner:<br>RANDALL SALLY | Plaintiff's/Petitioner's Attorney/Address<br>DANIEL JOHN ORLOWSKY<br>7777 BONHOMME AVE<br>SUITE 1910<br>ST. LOUIS, MO 63105 | Special Process Server 2 |
| vs. | | Special Process Server 3 |
| Defendant/Respondent:<br> PANERA BREAD COMPANY | Court Address:<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 | |
| Nature of Suit:<br>CC Other Tort | | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  PANERA LLC
                   **Alias:**

RA CSC-LAWYERS INCORP SERVICE
221 BOLIVAR
JEFFERSON CITY, MO 65101

*COURT SEAL OF*

*CITY OF ST LOUIS*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

**July 7, 2020**

_____          *Thomas Kloeppinger*
      Date                                     Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer**: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to:
_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____       _____
   Printed Name of Sheriff or Server             Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____    _____
                             Date                          Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.



## Cole County Sheriff
## IN THE 22ND JUDICIAL CIRCUIT, CITY OF ST LOUIS, MISSOURI

| | |
|---|---|
| **Judge or Division:**<br>REX M BURLISON | **Case Number: 2022-CC01133** |
| **Plaintiff/Petitioner:**<br>RANDALL SALLY<br><br>vs. | **Plaintiff's/Petitioner's Attorney/Address**<br>DANIEL JOHN ORLOWSKY<br>7777 BONHOMME AVE<br>SUITE 1910<br>ST. LOUIS, MO 63105 |
| **Defendant/Respondent:**<br>PANERA BREAD COMPANY | **Court Address:**<br>CIVIL COURTS BUILDING<br>10 N TUCKER BLVD<br>SAINT LOUIS, MO 63101 |
| **Nature of Suit:**<br>CC Other Tort | |

*Special Process Server 1*

*Special Process Server 2*

*Special Process Server 3*

*RECEIVED*

*JUL 13 2020 (Date File Stamp)*

## Summons in Civil Case

*COLE COUNTY SHERIFF'S OFFICE*

**The State of Missouri to:  PANERA BREAD COMPANY**
**Alias:**

221 BOLIVAR STREET
R/A CSC LAWYERS INC SERV
JEFFERSON CITY, MO 65101
*COURT SEAL OF*

*CITY OF ST LOUIS*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

| **July 7, 2020** | *Thomas Kloppinger* |
|---|---|
| Date | Clerk |

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the defendant/respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the defendant/respondent with _____, a person of the defendant's/respondent's family over the age of 15 years who permanently resides with the defendant/respondent.
☒ (for service on a corporation) delivering a copy of the summons and a copy of the complaint to: _Shelley Lewis_ (name) _Designee_ (title).
☐ other: _____

Served at _350 E. High St. lobby_ (address)
in _Cole_ (County/City of St. Louis), MO, on _7/14/2020_ (date) at _7:35am_ (time).

_Al T. Wheat_ _Dep. 2nd Sgt. 74_
Printed Name of Sheriff or Server          Signature of Sheriff or Server

*(Seal)*

Must be sworn before a notary public if not served by an authorized officer:
Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date                          Notary Public

| **Sheriff's Fees, if applicable** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

**ENTERED**

**JUL 27 2020**

**MS**

A copy of the summons and a copy of the petition must be served on each defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.